United States Court of Appeals
Fifth Circuit

**F I L E D**

April 15, 2004

Charles R. Fulbruge III
Clerk

REVISED MAY 3, 2004
IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-40557
_____

DEAN KINNEY; DAVID HALL

                              Plaintiffs - Appellees

     v.

BOBBY WEAVER, Etc.; ET AL

                              Defendants

J B SMITH, Smith County Sheriff; SMITH COUNTY TEXAS; W A
"BILL" YOUNG, Tyler Police Chief; CITY OF TYLER, TEXAS; EAST
TEXAS POLICE CHIEF'S ASSOCIATION; BOBBY WEAVER, Gregg County
Sheriff; BOB GREEN, Harrison County Sheriff; GREGG COUNTY
TEXAS; HARRISON COUNTY TEXAS; RONNIE MOORE, Kilgore Director
of Public Safety; CHARLES "CHUCK" WILLIAMS, City of Marshall
Police Chief; TED GIBSON, Nacogdoches Police Chief; CITY OF
KILGORE, TEXAS; CITY OF MARSHALL TEXAS; CITY OF NACOGDOCHES
TEXAS

                              Defendants - Appellants
_____

       Appeals from the United States District Court
            for the Eastern District of Texas
_____

Before KING, Chief Judge, and JOLLY, HIGGINBOTHAM, DAVIS, JONES,
SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES,
STEWART, DENNIS, CLEMENT, and PRADO, Circuit Judges.*

KING, Chief Judge:

_____

     *   Judge Pickering was not a member of the court when this
case was submitted to the court en banc and did not participate
in the decision.

Plaintiffs-Appellees Dean Kinney and David Hall brought suit against seven law enforcement officials, the seven cities or counties that employ these officials, and the East Texas Police Chiefs Association, asserting four claims: (1) a 42 U.S.C. § 1985(2) claim alleging conspiracy against Kinney and Hall because of their testimony in judicial proceedings, (2) a 42 U.S.C. § 1983 claim alleging violations of their rights to freedom of speech under the First Amendment, (3) a § 1983 claim alleging violations of their Fourteenth Amendment rights to due process of law, and (4) a state law claim alleging tortious interference with business relations. The law enforcement officials now bring an interlocutory appeal of the district court's order denying their motion for summary judgment, in which they asserted qualified immunity against the federal claims and state official immunity against the tort claim. A panel of this court affirmed in part and reversed in part. <u>Kinney v. Weaver</u>, 301 F.3d 253 (5th Cir. 2002), <u>vacated and reh'g en banc granted</u>, 338 F.3d 432 (5th Cir. 2003). On rehearing en banc, we now AFFIRM the district court's order denying the officials' claim of immunity from the § 1985 claim, the § 1983 First Amendment claim, and the state law claim; given material factual disputes, these claims cannot be disposed of on summary judgment. We REVERSE the district court's order denying immunity from the plaintiffs' § 1983 due process claim.

## I. FACTUAL AND PROCEDURAL BACKGROUND

While many of the basic facts in this case are uncontested, a number of the legally relevant facts are still disputed at this stage.  In Parts II and III of this opinion, we elaborate the appellate prism through which we must view the facts in this interlocutory appeal from the district court's decision denying qualified immunity.  As we explain there, we are required to accept the truth of the plaintiffs' summary judgment evidence, and we lack jurisdiction to review the genuineness of those factual disputes that precluded summary judgment in the district court.  Nonetheless, for ease of understanding and later discussion, our recitation of the facts will note both sides' assertions with respect to the material points of disagreement.

At the time of the events giving rise to this case, Kinney and Hall were instructors at the East Texas Police Academy ("ETPA"), a division of Kilgore College in Kilgore, Texas.  Founded by the East Texas Police Chiefs Association in 1966, the ETPA provides basic and advanced training for law enforcement officers in the greater East Texas area.  Kinney and Hall had been working at the ETPA for seventeen years and six years, respectively, under renewable one-year employment contracts.  The seven law enforcement officials (collectively "the Police Officials") asserting qualified immunity in this case are police chiefs or sheriffs who possess final authority over the training

3

of the officers employed by their respective agencies.[1]  Before
the fall of 1998, the Police Officials enrolled their officers in
ETPA courses on a regular basis, including courses taught by
Kinney and Hall.  The Police Officials were not contractually
bound to continue using either the ETPA's services or the
services of Kinney and Hall in particular.

In August 1998, Kinney and Hall testified as expert
witnesses for the family of Edward Gonzales, a teenager who was
fatally shot by a police sniper employed by the city of
Kerrville, Texas.  The Kerrville case did not involve officers
who had trained at the ETPA or police agencies that sent trainees
to the ETPA, as Kerrville lies several hundred miles from
Kilgore, outside the region from which the ETPA draws its
students.[2]  Kinney and Hall had never before testified as expert
witnesses against police officers, though Kinney had previously
testified as an expert in defense of the police.  The lawyer for
the victim's family in the Kerrville case approached the two

---

[1]     The Police Officials are: Nacogdoches Police Chief Ted
Gibson, Harrison County Sheriff Bob Green, Kilgore Director of
Public Safety Ronnie Moore, Smith County Sheriff J.B. Smith,
Gregg County Sheriff Bobby Weaver, Marshall Police Chief Charles
"Chuck" Williams, and Tyler Police Chief W.A. "Bill" Young.

[2]     The driving distance between the two cities is
approximately 435 miles.  As the district court noted by way of
comparison, that figure is roughly the same as the driving
distance between Boston, Massachusetts, and Washington, D.C.  As
the crow flies, the distance between Kilgore and Kerrville is 300
miles.

4

instructors because he had experienced difficulty finding local experts who were willing to testify against the police.

Based on their knowledge and experience as law enforcement instructors specializing in the use of force and firearms, Kinney and Hall testified that the Kerrville police officer had used excessive force and that the Kerrville police department had failed to implement the proper policies necessary to direct the conduct of officers acting as snipers. Kinney and Hall were technically under subpoena in the Kerrville case, but they testified voluntarily. Although Kinney and Hall originally planned to receive payment for their services, they decided, shortly after their depositions and before trial, that they would decline payment. Kinney's explanation for this decision, confirmed by Hall, is that the two "felt so strongly about the incident and what had happened to Eddie Gonzales" that they concluded that "it wouldn't be right to charge."

Soon after Kinney and Hall testified in the Kerrville case, William Holda, the president of Kilgore College, received letters from some of the Police Officials threatening to stop using the ETPA for officer training. In a letter dated September 15, 1998, Kilgore Director of Public Safety Ronnie Moore told Holda that he was concerned about the instructors' recent inquiries regarding a gun confiscated by the Kilgore police, because "[i]t is a well known fact within this agency that these instructors had

5

previously testified in another matter, against other Officers."[3] Moore said that testimony offered in support of the police was "acceptable and reasonable," but Kinney's and Hall's testimony "is in direct conflict with the basic fundamentals and expectations that we have come to enjoy from Academy instructors." Moore informed Holda that "[d]ue to these circumstances, our agency will be exploring other options to provide the professional training necessary for our Officers."

In a letter dated September 29, 1998, Charles Williams, the chief of the city of Marshall's police department, also complained to Holda about the instructors' expert testimony. He wrote, "I think it is deplorable . . . that instructors for our Police Academy hire themselves out as an expert witness: AGAINST law enforcement agencies." Williams stated further that "[t]he Marshall Police Department will not attend any courses taught by

---

[3] Kinney and Hall offered an innocent explanation for their inquiries about the seized gun, saying that they hoped to shoot the gun for their own enjoyment and edification—as local police had let them do on other occasions—not because they were gathering information in order to testify as expert witnesses in defense of the gun's owner. The defendants' briefs have highlighted the gun incident, but the plaintiffs' evidence suggests that it was not a motivating factor in the boycott. As described below, the other Police Officials who wrote to Holda did not mention the gun incident; Kinney's and Hall's Kerrville testimony was the only stated reason for threatening to boycott the ETPA. The Kerrville testimony was, moreover, the only complaint reflected in the minutes of the meeting at which the local police agencies decided to boycott the plaintiffs. The district court found that there was sufficient evidence for a jury to conclude that the plaintiffs' testimony was the reason for the boycott. Kinney v. Weaver, 111 F. Supp. 2d 831, 838 (E.D. Tex. 2000).

Mr. David Hall or Mr. Dean Kinney due to the liability they place on this Police Department." Williams attached three newspaper articles that mentioned Kinney's and Hall's roles as expert witnesses for the plaintiffs in the Kerrville case.

The summary judgment evidence submitted by Kinney and Hall includes Williams's deposition, in which he testified that he learned of Kinney's and Hall's involvement in the Kerrville case when he received, probably in August 1998, an anonymous package containing the three newspaper articles that he attached to his letter to Holda. In addition to the articles, the package contained a note telling Williams to contact Moore for more information, which Williams did shortly after receiving the package.

Williams forwarded copies of his September 29, 1998, letter and the attached articles to Moore and four of the other Police Officials, namely, Bill Young, the chief of police for the city of Tyler; Bob Green, the sheriff of Harrison County; Bobby Weaver, the sheriff of Gregg County; and J.B. Smith, the sheriff of Smith County. The set of documents that Williams forwarded to Young, which is in the summary judgment record, also included a copy of Moore's September 15 letter to Holda.

Young sent a letter to Holda on September 30, 1998, the day after he received the letters and articles from Williams. Young wrote that he was "greatly disturbed by the recent news that [Hall and Kinney] have acted in the capacity of 'Expert

Witnesses' to testify against another law enforcement agency and it's [sic] officers." He emphasized he was writing "not only as Chief of Police of an agency that is one of your largest customers, but also as President of the East Texas Police Chief's [sic] Association." Noting that "[i]t is not our preference to have these two instructors teach our officers and also engage in legal combat with them in the judicial system," Young stated that "[t]his matter will force us to consider alternative methods to achieve our training needs if not resolved as soon as possible."

In an attempt to address the defendants' complaints, Holda met with Moore, Williams, and Young on September 30, 1998. Also in attendance were three other law enforcement officers to whom Williams had forwarded copies of his letter to Holda, including Defendant Green. In his affidavit, Holda gave an account of this meeting that was largely confirmed by Moore, Williams, Young, and Green in their depositions. According to Holda, all four men "made it clear" (1) that "they wanted Mr. Hall and Mr. Kinney removed from the [ETPA] faculty because their testimony in the Kerrville trial created a conflict of interest with their [ETPA] responsibilities" and (2) "that they would no longer send officers and recruits to the [ETPA] for training if Mr. Hall and Mr. Kinney remained on the Academy faculty."

Defendants Moore, Williams, and Green later agreed to send students to the ETPA on the condition that their officers not be instructed by Kinney and Hall, but Holda's affidavit reports that

8

Young continued to insist that Kinney and Hall also be removed from the ETPA faculty completely. According to Holda, "the stated reason for [the attendees'] refusals to send their officers and recruits for training by Mr. Hall and Mr. Kinney was that their testimony in the Kerrville trial criticized the law enforcement officer on trial." Testifying in Kerrville had, in the view of the defendants, "created a conflict of interest between [the plaintiffs] and law enforcement officers and the law enforcement community."

The defendants repeatedly expressed a concern that Kinney's and Hall's testimony created "conflicts of interest" and violated principles of "cooperative responsibility," but their letters and affidavits do not elaborate upon the import of those phrases. In their depositions, some of the Police Officials admitted that, in their view, an unacceptable conflict of interest exists whenever a police instructor testifies against a police officer, regardless of location and regardless of whether the instructor had trained the officer. Such a conflict does not exist, in their view, when an instructor testifies for police officers.

Shortly after the September 30 meeting, Holda met with Kinney and Hall to apprise them of the situation. Kinney and Hall assured Holda that they would never testify as experts against any officer who had been trained at the ETPA or any

9

agency that had sent officers to the ETPA for training.[4]  Kinney
further promised that he would not accept payment for any future
work on behalf of plaintiffs in police misconduct cases.  In a
letter dated October 5, 1998, Holda conveyed Kinney's and Hall's
assurances to the attendees of the September 30 meeting and
invited them to attend another meeting along with other East
Texas law enforcement officials for the purpose of discussing
their concerns directly with Kinney and Hall.  None of the
invitees indicated an interest in such a meeting or came to the
ETPA on the date suggested by Holda.  Hall states in his
affidavit that one of the defendants told him, on October 13,
that the instructors had committed a "sin" for which they could
get no forgiveness.

On October 22, 1998, the East Texas Police Chiefs
Association held its quarterly meeting in Kilgore.  The
attendance was unusually large.  All of the Police Officials were

---

[4]     The defendants have suggested that Kinney and Hall told
their students that the students might someday face Kinney and
Hall in court.  In their affidavits and depositions, Kinney and
Hall concede that, if subpoenaed to testify against one of their
students, they would testify truthfully as to what they taught
the student; Kinney and Hall also state, however, that they do
not tell their students that they would testify against them as
experts.  Regarding the defendants' assertion that Kinney once
said in class that he would "go to the highest bidder" and could
face the students as an expert witness, Kinney responds that he
might have made such a remark as a obvious joke.  The students
apparently took the comment that way, as the only piece of
evidence relating to a student's reaction to the comment says
that "I never gave much thought to what he said and believed in
my mind that he was just talking."

present, except for Smith, who later spoke to a deputy who had attended the meeting. The minutes of this meeting reflect that Kinney's and Hall's involvement in the Kerrville case was prominent on the agenda. Defendants Young (who was president of the East Texas Police Chiefs Association at the time), Williams, Moore, Gibson, and Weaver voiced their disapproval of Kinney's and Hall's work on behalf of the plaintiffs in the Kerrville case, and all five officials stated their intention to ensure that Kinney and Hall did not train their officers. Subsequently, the minutes state that "it was agreed that none of the Chiefs or Sheriffs present would send their officers to any classes taught by either [Kinney or Hall]." The minutes do not reflect discussion of any other complaints concerning Kinney and Hall, nor do they reflect any mention of the substance of the instructors' testimony in Kerrville. Some of the defendants admitted in their depositions that they did not know what Kinney and Hall had said in the Kerrville trial, only that they had testified against the police.

Several local media organizations reported on the controversy that had arisen between the ETPA and some of the area police agencies. On television and in print, several defendants are documented announcing their intention either to use a training institution other than the ETPA or to bar their officers from taking Kinney's and Hall's courses. Smith was quoted as stating that Kinney and Hall had "prostituted themselves" by

11

testifying against another officer.  Young was shown on television stating that he would not send officers to the ETPA until Kinney and Hall were reassigned or fired.  A newspaper article quoted Holda as saying that Young was "asking me to do something he wouldn't do."  According to Holda, the instructors had received excellent evaluations and their testimony was "freedom of speech."  Weaver told a television reporter that Kinney and Hall had violated "an unwritten code."[5]

The Police Officials followed through on their threats both by cancelling enrollments in the plaintiffs' classes and by barring their officers from enrolling in the plaintiffs' courses in the future.  The summary judgment evidence indicates that this boycott was quite effective.  Holda stated that Kinney's and Hall's courses "were boycotted by a sufficient number of law enforcement agencies so that enrollment was insufficient to make their classes and, therefore, could not be economically continued."  The boycott began in October 1998, and by November 10, 1998, all of Kinney's and Hall's basic classes had been

---

[5]     The defendants admitted (either in their pleadings, depositions, or during the hearing in the district court) to making the media-reported statements recounted in this paragraph, and the defendants' admissions are proper summary judgment evidence.  The record also contains a great many other newspaper clippings quoting both Holda and the defendants; those reports are relevant, without regard to the truth of the matter asserted, to the defendants' argument that the plaintiffs' testimony created a public rift between the ETPA and the local police agencies.

dropped from the ETPA schedule, and many of their off-campus classes had been cancelled.

Aware that the enrollment in his courses was down and concerned that he would not be able to withstand a cut in pay, Hall resigned from the ETPA effective January 3, 1999, because he anticipated that his ETPA contract would not be renewed. He was hired as a patrol officer at the Carrollton Police Department, the job he had left to work at the ETPA six years earlier.

Kinney's ETPA teaching contract extended through the 1998-1999 academic year, and he continued to teach during that time. The boycott remained in effect, however, and the ETPA provided alternate instructors for all of Kinney's classes to ensure that the law enforcement agencies that refused to enroll their officers in Kinney's courses could still send trainees to the ETPA. Kinney stated in his affidavit that he "had minimal class time during the first few months of the 1999 calendar year"—specifically, he "had no time in the basic police academy and very little in the in-service classes." In their depositions taken in August 1999, the Police Officials stated that they continued to prohibit enrollment either in Kinney's courses or in all ETPA courses because Kinney remained on the ETPA faculty.

Kilgore College did not renew Kinney's 1998-1999 contract for his position as an ETPA instructor, but rather offered him a contract as a lecturer in the Criminal Justice Department of Kilgore College for the following academic year. The salary for

13

this position was $15,000 less than Kinney earned as an ETPA instructor.  He had not taught in the Criminal Justice Department previously, but rather had been an ETPA instructor for the entire seventeen-year period that he had been working for Kilgore College.  According to Holda, "Kilgore College did not anticipate a change in the teaching assignment for either Mr. Kinney or Mr. Hall prior to the decisions by certain law enforcement agencies to boycott classes taught by Mr. Hall and Mr. Kinney."

On April 7, 1999, Kinney and Hall filed a complaint in federal district court against the seven Police Officials, their respective cities or counties of employment, and the East Texas Police Chiefs Association, alleging that the defendants had "blackballed" Kinney and Hall "in retaliation for their truthful testimony on behalf of the victim of a police shooting."[6]  Kinney and Hall claimed violations of: (1) their rights to testify freely under 42 U.S.C. § 1985(2), (2) their rights to free speech under the First and Fourteenth Amendments, (3) their rights to due process of law under the Fourteenth Amendment, and (4) Texas tort law.  The defendants (both the Police Officials and the entities) moved for summary judgment on the merits of all four claims, and the Police Officials also asserted qualified immunity from the plaintiffs' federal claims and state official immunity

---

[6]    The suit originally named an eighth police chief and his agency of employment as additional defendants, but the district court granted an agreed motion to dismiss the claims against those parties.

14

from the state tort claim.  The district court denied the defendants' motion for summary judgment on all grounds.  <u>Kinney</u>, 111 F. Supp. 2d at 845.

The Police Officials brought an interlocutory appeal of the district court's order denying summary judgment on their immunity defenses.  A divided panel of this court affirmed the district court's order denying immunity with respect to the plaintiffs' claims under § 1985, the First Amendment, and state law, but we reversed the district court with respect to the due process claim.  <u>Kinney</u>, 301 F.3d at 286.  The en banc court granted rehearing in an order dated July 9, 2003, 338 F.3d 432 (5th Cir. 2003), and we heard oral argument on September 25, 2003.

## II. JURISDICTION

We must first address our jurisdiction to hear this appeal. This court has jurisdiction over appeals of "final decisions" of the district courts.  <u>See</u> 28 U.S.C. § 1291 (2000).  Although a denial of a defendant's motion for summary judgment is ordinarily not immediately appealable, the Supreme Court has held that the denial of a motion for summary judgment based upon qualified immunity is a collateral order capable of immediate review.  <u>See</u> <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 530 (1985).[7]  Our jurisdiction is significantly limited, however, for it extends to such appeals

---

[7]     This court has held that orders denying official immunity under Texas law are immediately appealable to the same extent as denials of qualified immunity under federal law.  <u>See</u> <u>Cantu v. Rocha</u>, 77 F.3d 795, 803-04 (5th Cir. 1996).

15

only "to the extent that [the denial of summary judgment] turns on an issue of law." Id.

As will be explained in greater detail below, officials enjoy qualified immunity to the extent that their conduct is objectively reasonable in light of clearly established law. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Whenever the district court denies an official's motion for summary judgment predicated upon qualified immunity, the district court can be thought of as making two distinct determinations, even if only implicitly. First, the district court decides that a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law. Second, the court decides that a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct. According to the Supreme Court, as well as our own precedents, we lack jurisdiction to review conclusions of the second type on interlocutory appeal. See Johnson v. Jones, 515 U.S. 304, 313, 319-20 (1995); Lemoine v. New Horizons Ranch & Ctr., Inc., 174 F.3d 629, 634 (5th Cir. 1999).[8] Stated differently, in an

_____

[8] Since we lack jurisdiction to review a denial of summary judgment based on the district court's conclusion that fact questions exist regarding whether the defendants engaged in conduct that would violate clearly established law, officials may sometimes be required to proceed to trial even though the ultimate resolution of those factual disputes may show that they are entitled to qualified immunity from liability. The Supreme Court recognizes that this "threatens to undercut" the policy of affording immunity from trial, but the Court has said that "countervailing considerations" nonetheless support this

16

interlocutory appeal we cannot challenge the district court's assessments regarding the sufficiency of the evidence——that is, the question whether there is enough evidence in the record for a jury to conclude that certain facts are true.[9]

We do, however, have jurisdiction to the review the <u>first</u> type of determination, the purely legal question whether a given course of conduct would be objectively unreasonable in light of clearly established law.  See <u>Behrens v. Pelletier</u>, 516 U.S. 299, 312-13 (1996) (stating that <u>Johnson</u> permits a defendant official "to claim on appeal that all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment met the <u>Harlow</u> standard of 'objective legal reasonableness'").  That is, we have jurisdiction only to decide whether the district court erred in concluding as a matter of law that officials are not entitled to qualified immunity on a given set of facts.  As one of our cases succinctly puts it, "we can review the <u>materiality</u> of any factual disputes, but not their

---

limitation on interlocutory jurisdiction.  See <u>Johnson</u>, 515 U.S. at 317-18.

[9] The <u>Johnson</u> Court provided three reasons for its conclusion that arguments relating to the sufficiency of the evidence are not immediately appealable: (1) <u>Mitchell</u> had said that interlocutory appeal was appropriate only for reviewing the district court's purely legal rulings, (2) questions regarding sufficiency of the evidence are not "separable" from the underlying merits of the case for purposes of the collateral order doctrine, and (3) reviewing factual disputes on interlocutory appeal was undesirable as a matter of judicial administration.  See <u>Johnson</u>, 515 U.S. at 313-17.

17

genuineness." <u>Wagner v. Bay City</u>, 227 F.3d 316, 320 (5th Cir. 2000).

Given the above, the plaintiffs' suggestion before the panel that we lack jurisdiction over this appeal is incorrect. We do have jurisdiction, but only to the extent that the appeal concerns the purely legal question whether the defendants are entitled to qualified immunity on the facts that the district court found sufficiently supported in the summary judgment record. See <u>Behrens</u>, 516 U.S. at 312-13.[10]

### III. STANDARD OF REVIEW

The standard of review that we apply in an interlocutory appeal asserting qualified immunity differs from the standard employed in most appeals of summary judgment rulings. Ordinarily, we would review the district court's denial of summary judgment <u>de novo</u>, applying <u>the same standard</u> as the district court. See <u>Vela v. City of Houston</u>, 276 F.3d 659, 666

---

[10] Although the briefs submitted by both parties in this case address only the issue whether the district court properly denied the Police Officials' claims of qualified immunity, the notices of appeal filed with this court name not only the Police Officials, but also the cities, counties, and the East Texas Police Chiefs Association. The doctrine of qualified immunity applies only to government officials, and thus the portion of the motion for summary judgment addressing the plaintiffs' claims against the cities, counties, and the East Texas Police Chiefs Association attacked those claims on grounds apart from qualified immunity. Because the district court's order denying summary judgment to the entities is not a final decision within the meaning of § 1291, we do not have jurisdiction over an appeal of such an order. Accordingly, we dismiss the appeal of the district court's summary judgment order brought by the cities, counties, and the East Texas Police Chiefs Association.

18

(5th Cir. 2001).  The district court, of course, applies the standard of Rule 56, according to which summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  On appeal, we would ordinarily apply that same Rule 56 standard, and we would reverse the district court's denial of summary judgment if we concluded that the district court found a genuine factual dispute when, on our own review of the record, no such genuine dispute exists.  But, as explained above, in an interlocutory appeal we lack the power to review the district court's decision that a genuine factual dispute exists.  Therefore, we do not apply the standard of Rule 56 but instead consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment.  See Behrens, 516 U.S. at 313; Jones, 515 U.S. at 313.

Where factual disputes exist in an interlocutory appeal asserting qualified immunity, we accept the plaintiffs' version of the facts as true.  Wagner, 227 F.3d at 320 ("Even where, as here, the district court has determined that there are genuine disputes raised by the evidence, we assume plaintiff's version of the facts is true . . . ."); see also Gonzales v. Dallas County, 249 F.3d 406, 411 (5th Cir. 2001) ("[O]n interlocutory appeal the public official must be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised

19

by the appeal.").[11]  When the district court fails to set forth the factual disputes that preclude granting summary judgment, we may be required to review the record in order "to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed."  Johnson, 515 U.S. at 319.  In this case, however, the district court wrote a detailed opinion that carefully identified those factual disputes that prevented summary judgment.[12]  In so doing, the district court also assessed the factual import of the plaintiffs' summary judgment evidence.  Given the nature of our jurisdiction over an interlocutory appeal asserting qualified immunity, these factual disputes, together with the district court's concomitant assessment of what facts are supported by the plaintiffs' summary judgment evidence, necessarily play a critical role in our decision.  We therefore set them forth at length:

---

[11]    The defendants recognize this point and conceded in their reply brief before the panel that they must "accept the material facts reasonably suggested by Kinney's and Hall's summary-judgment proof."

[12]    To be sure, the district court's opinion did not (and could not be expected to) discuss every aspect of the conflicting evidence.  The Police Officials' briefs have, at times, discussed aspects of the facts that the district court did not explicitly address.  In responding to those arguments, we do not, as the dissent alleges "freely evaluate[] the disputed evidence," Jones dissent at 5.  We do not purport to resolve any factual disputes, as this case is at the summary judgment stage.  Rather, we seek only to "determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed," for purposes of summary judgment.  See Johnson, 515 U.S. at 319.

20

The plaintiffs contend that the record reflects that the defendants "blackballed" or boycotted the plaintiffs' classes at the Academy because the plaintiffs broke the "code of silence." . . .

The defendants, on the other hand, have maintained that they refused to send their officers to classes taught by Kinney and Hall because of potential conflicts of interests . . . .

. . . The record is full of evidence, both circumstantial and direct, backing each of the respective party's positions. After reviewing the record and the arguments of the parties, the court concludes that summary judgment is not appropriate and this case may proceed to trial.

Kinney, 111 F. Supp. 2d at 835.

There is ample evidence currently in the record for a jury to conclude that the defendants' actions were intended to suppress the plaintiffs' rights to free speech.

Id. at 839.

There is ample evidence in the record for a jury to conclude that the defendants conspired to deter the plaintiffs from testifying in court by boycotting their business.

Id. at 840.

There are genuine issues of fact remaining in this case as to whether the plaintiffs' expert testimony could legitimately cause any disruptions in the defendants' operations. Moreover, it must be determined whether these disruptions, if any, were the result of a perceived "conflict of interest" or the "blackballing" of plaintiffs for turning against one of their own.

Id. at 843.

Plaintiffs' evidence reflects a dogged determination by the defendants to rid Kilgore College of the plaintiffs as instructors in retaliation for speaking out about excessive force by police officers. The court concludes that the acts alleged in the complaint and found in the record, if proven at trial, would violate "clearly established" law.

Id. at 845.

21

In reviewing the district court's conclusions concerning the legal consequences⸻the materiality⸻of the facts, our review is of course <u>de novo</u>.  See <u>Lemoine</u>, 174 F.3d at 634.

#### IV. QUALIFIED IMMUNITY

The doctrine of qualified immunity seeks to strike a balance between competing social objectives, providing breathing space for the "vigorous exercise of official authority" while at the same time allowing a possibility of redress for victims of officials' abuses.  See <u>Butz v. Economou</u>, 438 U.S. 478, 504-06 (1978).  Therefore, as against claims under federal law,[13] "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow</u>, 457 U.S. at 818.  The Supreme Court noted in <u>Harlow</u> that in most cases, the "of which a reasonable person would have known" language in the qualified immunity standard does not add anything to the "clearly established law" requirement because "a reasonably competent public official should know the law governing his conduct."  <u>Id.</u> at 818-19.  Not long after <u>Harlow</u>, the Court refined the qualified immunity

---

[13]    With respect to the plaintiffs' state law claim, we must apply the Texas law of official immunity, which differs slightly from the federal standard.  Since we reinstate the portion of the panel opinion that dealt with the state law claim, we do not discuss official immunity under Texas law in today's opinion.

22

standard by defining "clearly established" in a way that encompasses the "objective reasonableness" inquiry: To be "clearly established" for purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Thus, as this court has recognized, in light of the Anderson definition of "clearly established," the question "whether the . . . right was clearly established at the time the defendant acted . . . requires an assessment of whether the official's conduct would have been objectively reasonable at the time of the incident." Conroe Creosoting Co. v. Montgomery County, 249 F.3d 337, 340 (5th Cir. 2001).

The Supreme Court has recently provided us with additional guidance regarding the nature of "clearly established" law. It had already been known since Anderson that the "clearly established" standard does not mean that officials' conduct is protected by qualified immunity unless "the very action in question has previously been held unlawful." 483 U.S. at 640. In the Court's latest pronouncement on the subject, Hope v. Pelzer, 536 U.S. 730, 739 (2002), the Court held that one of our sister circuits had erred in defining clearly established law in such a way that qualified immunity was mandated unless the facts of past cases were "materially similar" to the conduct then being

23

challenged.  The requirement of "materially similar" facts, the Court determined, was "not consistent with our cases."  Id.

Yet, at the same time, an official does not lose qualified immunity merely because a certain right is clearly established in the abstract.  It is clearly established that the government may not deny due process or inflict cruel and unusual punishments, for example, but those abstract rules give officials little practical guidance as to the legality of particular conduct.  Qualified immunity should not be denied unless the law is clear in the more particularized sense that reasonable officials should be "on notice that their conduct is unlawful."  Saucier v. Katz, 533 U.S. 194, 206 (2001).  The central concept is that of "fair warning": The law can be clearly established "despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights."  Hope, 536 U.S. at 740 (internal quotation marks omitted).

"A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."  Siegert v. Gilley, 500 U.S. 226, 232 (1991).  Therefore, before engaging in the inquiry into whether the official unreasonably violated clearly established

24

law, we should first determine whether the challenged conduct, viewed in the light most favorable to the plaintiff, would actually amount to a violation of federal law in the first place. Saucier, 533 U.S. at 201. In conducting this initial inquiry, we employ currently applicable constitutional standards. McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam).

## V. CLAIM UNDER 42 U.S.C. § 1985

Section 1985 provides, in relevant part:

> (2) If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified . . .
> (3) . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985 (2000).

According to Kinney and Hall, the Police Officials violated the statute by conspiring to mount a campaign of economic retaliation—which took the form of boycotting Kinney's and Hall's classes and attempting to have them terminated—on account of the instructors' testimony against a police officer in the Kerrville case. The district court denied the defendants' motion

25

for summary judgment, finding that the plaintiffs had produced sufficient evidence of an illegal conspiracy and that the plaintiffs' rights under § 1985 were clearly established at the time. <u>Kinney</u>, 111 F. Supp. 2d at 840.

Much of the argument in the district court concerned the issue of whether the plaintiffs adduced sufficient evidence of a conspiracy. The district court's determination that there was sufficient evidence of a conspiracy is not at issue in this interlocutory appeal. Instead, the Police Officials' main argument on appeal has been the legal argument that § 1985 offers no protection to expert witnesses, but instead reaches only fact witnesses. This argument faces an immediate textual impediment, inasmuch as the statute says "<u>any</u> party or witness." Nonetheless, the defendants would draw a distinction between the two kinds of witnesses based upon the assertion that expert testimony, unlike fact testimony, is "readily accessible" and can easily be replaced with the testimony of another expert. Expert witnesses, in the defendants' view, therefore need less protection from intimidation. The Police Officials contend, moreover, that the enacting Congress could not have meant to protect expert witnesses because the practice of calling expert witnesses did not exist at the time that § 1985 was enacted, in the aftermath of the Civil War.

Based upon the statute's plain language, we have little difficulty in concluding that "any party or witness" includes

26

expert witnesses.  Since the language is clear on this point, there is little room for the defendants' extra-textual arguments for excluding experts.  In any case, to the extent that their arguments are relevant, they fail to persuade.  The defendants are simply incorrect when they claim that the enacting Congress could not have been familiar with expert witnesses.  Expert witnesses have been known for hundreds of years.  See Learned Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 HARV. L. REV. 40, 45-50 (1901).  Leaving that to one side, the defendants are also incorrect in assuming that the statute's reach is restricted to those factual scenarios that the enacting legislature could have specifically contemplated.  On the contrary, the Supreme Court has instructed that Reconstruction-era civil rights statutes are to be given "'a sweep as broad as [their] language,'" Griffin v. Breckenridge, 403 U.S. 88, 97 (1971) (alteration in original) (quoting United States v. Price, 383 U.S. 787, 801 (1966)), ensuring that their protections remain relevant to modern circumstances.[14]

In answer to the defendants' argument that expert testimony is easily replaceable and therefore less worthy of protection than fact testimony, we would point out that expert testimony on

_____

[14]    In calling for a narrow construction of § 1985(2) that departs from the text, Judge Barksdale's dissent cites Kush v. Rutledge, 460 U.S. 719 (1988).  But Kush is notable because it rejected a non-textual limiting construction that certain circuits, including this one, had erroneously embraced.  Id. at 723, 726.

27

police procedures will not be "readily accessible" if, as happened here, police officials can prevent the persons with the relevant expertise from testifying, even in cases hundreds of miles away.[15]  This court's cases involving Sixth Amendment claims of witness intimidation have not suggested that experts need less protection than fact witnesses.  See, e.g., United States v. Bieganowski, 313 F.3d 264, 291 (5th Cir. 2002); United States v. Dupre, 117 F.3d 810, 822-23 (5th Cir. 1997).  In any case, the defendants' unsupported conjectures about experts' relative "need" for protection cannot displace the text's plain words: "any party or witness."  We therefore hold that § 1985(2) protects expert witnesses.

We further conclude that the statute's coverage of expert witnesses was "clearly established" for purposes of qualified immunity.  No reasonable official would find the terms "any . . . witness" ambiguous on this point.  Although a body of cases is typically required in order to give clear shape to vague constitutional provisions referring to "due process of law" or "cruel and unusual punishments," we believe that the text is itself sufficient to put reasonable officials on notice that the

_____

[15]     As described earlier, the defendants' position is that no testimony against the police is too distant to warrant condemnation.  The plaintiffs in the Kerrville case sought help from Kinney and Hall because they had experienced difficulty finding an expert from their local area.

word "witness" includes expert witnesses.[16] No case of which we are aware has even remotely suggested that § 1985(2) does not apply to experts. On the contrary, the only case addressing the issue treats it as obvious that the statue encompasses experts. See Chahal v. Paine Webber Inc., 725 F.2d 20 (2d Cir. 1984). Given the clarity of the phrase "any . . . witness," the absence of more cases like Chahal is hardly surprising. Nor would an official find a basis for excluding experts if he or she happened to be familiar with the law in related contexts. As we have just mentioned, no distinction between fact witnesses and expert witnesses exists in our Sixth Amendment witness intimidation cases, nor is any such distinction drawn in cases involving the absolute immunity that protects witnesses from civil liability arising from their testimony.[17]

---

[16] We find untenable any general proposition that cases are necessarily required in order to create clearly established law. As the Supreme Court explained in a case involving the criminal counterpart to § 1985, the civil doctrine of qualified immunity has "the same objective" as the rule that due process requires "fair warning" before criminal liability may be imposed. See United States v. Lanier, 520 U.S. 259, 270-71 (1997). "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Id. at 267 (emphasis added). We doubt that the Police Officials would be willing to agree that the contents of the Texas Penal Code or Title 18 of the U.S. Code are inherently incapable of giving notice of their own meaning, even as to phrases as transparent as "any . . . witness."

[17] See Briscoe v. LaHue, 460 U.S. 325, 341-42 (1983); Storck v. Suffolk County Dep't of Soc. Servs., 62 F. Supp. 2d 927, 945 (E.D.N.Y. 1999) ("[The absolute] immunity extends to all persons, whether governmental, expert, or lay witnesses, integral to the trial process.") (citing Briscoe).

29

The defendants make a more plausible argument when they assert that their conduct did not "injure" Kinney and Hall in their "person[s] or property" within the meaning of the statute. Pointing out that they were not contractually obligated to continue sending their officers to the ETPA or to any particular instructor for training, the Police Officials argue that Kinney and Hall lacked a property interest in the Police Officials' enrollment of their officers in Kinney's and Hall's courses. The Police Officials further contend that Kinney and Hall were at-will employees of the ETPA; thus, under precedents interpreting the Due Process Clause, the instructors lacked any property interest in continued employment at the ETPA.[18] Consequently, the Police Officials argue, it would have been reasonable for them to believe that their conduct did not "injure [a] witness in his person or property" for purposes of the statute.

Regarding the question whether the plaintiffs have set forth a violation of the statute under current law, the Police Officials' argument is foreclosed by Haddle v. Garrison, 525 U.S. 121 (1998), in which the Supreme Court held that "third-party interference with at-will employment relationships[] states a claim for relief under § 1985(2)." Id. at 126. In Haddle, the

---

[18] Kinney and Hall had contracts for the 1998–1999 academic year, so they were not at-will employees for that term. The relationship was at-will in the sense that Kinney and Hall had no contract for continued employment beyond the contract period, i.e., no right to automatic renewal.

Court reasoned that because "[t]he gist of the wrong at which § 1985(2) is directed is not deprivation of property, but intimidation or retaliation against witnesses in federal-court proceedings," the loss of at-will employment can injure a plaintiff for purposes of the statute even though he or she lacks a property interest for purposes of the Due Process Clause. Id. at 125-26. The Police Officials certainly interfered with Kinney's and Hall's employment within the meaning of Haddle. Not only did they avowedly act in concert to pull their students from the plaintiffs' classes, but, according to the district court, they also tried to have the plaintiffs fired from their jobs. See Kinney, 111 F. Supp. 2d at 845 (referring to evidence of "a dogged determination by the defendants to rid Kilgore College of the plaintiffs"); see also supra at pp. 8, 12 (recounting the Police Officials' demands that Kinney and Hall be fired). The plaintiffs suffered economic injury as a result of the defendants' actions: Kinney's ETPA contract was not renewed, and Hall left the ETPA in apprehension of suffering the same fate. Holda's affidavit confirms that, before the defendants began their campaign, the ETPA anticipated renewing the plaintiffs' contracts. Coercing an employer into firing an employee is the classic case of interfering with employment relations.[19]

---

[19] Given the facts of this case, it is incorrect to say, as Judge Barksdale's dissent repeatedly does, that the only thing that the Police Officials did was to benignly decline to enroll their officers in the plaintiffs' classes. The defendants

31

Although a precedent so commanding as Haddle is not necessary to establish that a reasonably competent official would have understood that certain conduct was unlawful, we agree with the Police Officials that it was not clearly established before Haddle that the "property" contemplated by § 1985(2) included at-will employment. The Supreme Court granted certiorari in Haddle to resolve a split among the circuits with regard to the status of at-will employment, 525 U.S. at 124, and this circuit had not clearly announced its view on the subject. Thus, given the absence of a definitive judicial interpretation of "property" for purposes of § 1985(2), coupled with the fact that at-will employment is not "property" for purposes of the Due Process Clause, we cannot conclude that § 1985(2) by its terms clearly established that third-party interference with at-will employment was injury to property. On this point, the law became clearly established only after Haddle.[20]

---

interfered with the plaintiffs' employment, and if that is an absurd result, then the dissent's quarrel is with Haddle, not with us.

[20]     Hall left the ETPA before the expiration of his contract for the 1998-1999 academic year, assertedly because of fears over job security. To the extent that the Police Officials interfered with Hall's rights under this contract, as opposed to Hall's prospects of continued employment beyond the contract, the Police Officials did more than merely interfere with at-will employment. However, the plaintiffs have not argued that the defendants' interference with Hall's contract violated law that was clearly established even before Haddle, and thus we need not decide that question.

32

The Police Officials and Judge Barksdale argue that <u>Haddle</u> is irrelevant to this case because it was issued on December 14, 1998, after the events of September and October 1998, when the conspiracy began. They are mistaken in believing that the conduct that forms the basis of the plaintiffs' statutory claim took place solely in or before October 1998. Subsection 1985(3)'s cause of action specifically extends liability to any persons who "do, or cause to be done, <u>any act in furtherance</u> of the object of [a] conspiracy [to injure a witness in retaliation for his or her testimony]." (emphasis added).[21] Kinney and Hall provided evidence that the Police Officials affirmatively

_____

[21] In their petition for rehearing, the defendants raised for the first time an argument that the plaintiffs do not have statutory standing to sue under § 1985(3). The argument is that even though § 1985(2) prohibits the intimidation of "part[ies] or witness[es]" (as well as many other categories of persons), the remedy described in the last clause of § 1985(3) uses the phrase "party so injured" to mean "litigant so injured" rather than "person so injured." There is a split of authority with respect to the point raised by the defendants. <u>Compare</u> <u>Chavis v. Clayton County Sch. Dist.</u>, 300 F.3d 1288, 1292 (11th Cir. 2002), <u>Heffernan v. Hunter</u>, 189 F.3d 405, 409-10 (3d Cir. 1999), <u>and</u> <u>Brever v. Rockwell Int'l Corp.</u>, 40 F.3d 1119, 1125 n.7 (10th Cir. 1994) (all holding that non-party witnesses have standing), <u>with</u> <u>Blankenship v. McDonald</u>, 176 F.3d 1192, 1196 (9th Cir. 1999), <u>and</u> <u>Rylewicz v. Beaton Servs., Ltd.</u>, 888 F.2d 1175, 1180 (7th Cir. 1989) (both holding that non-party witnesses lack standing). We note that there is a question as to our jurisdiction to entertain an argument relating to statutory standing (as opposed to constitutional standing) in the context of an interlocutory appeal. <u>See</u> <u>Summit Med. Assocs., P.C. v. Pryor</u>, 180 F.3d 1326, 1334-36 (11th Cir. 1999); <u>Triad Assoc. v. Robinson</u>, 10 F.3d 492, 496 n.2 (7th Cir. 1993). We need not resolve the question, however, as the defendants did not raise this issue in the district court or before the panel. They are of course free to raise the argument in further proceedings below.

33

committed "act[s] in furtherance" of their conspiracy to have Kinney and Hall removed from their ETPA positions long after Haddle, not just before. In particular, Kinney and Hall claim (and the Police Officials conceded in their depositions) that the Police Officials continued to prohibit their officers from enrolling in Kinney's or Hall's classes for the entire time that they were working as instructors at the ETPA; at least one of the defendants continued to boycott the entire ETPA during that time. Hall's resignation from the ETPA became effective on January 3, 1999, and Kinney's ETPA contract did not expire until September 1999. Viewing the summary judgment record in the light most favorable to Kinney and Hall, it is reasonable to infer that if the Police Officials had ceased their boycott in the wake of Haddle, Holda may have reconsidered his conclusion that it was no longer economically viable for Kilgore College to offer Kinney's and Hall's courses, and thus Kinney and Hall might not have been injured. In the end, it may be that much of the damage was done while the Police Officials still enjoyed qualified immunity; nonetheless, Kinney and Hall are entitled to pursue their claims for any damages traceable to "act[s] in furtherance" that occurred after the illegality of the Police Officials' actions become clear.

Viewing the facts in the light most favorable to Kinney and Hall, the conduct at issue in this case falls within the core of § 1985's post-Haddle meaning. There was sufficient evidence to

show that the defendants agreed to retaliate against Kinney and Hall on account of the instructors' testimony against police officers in a federal case, and, as in Haddle, the retaliation took the form of interference with the instructors' employment relationship, namely by boycotting their classes and pressuring the ETPA to fire them.  We thus conclude that the Police Officials' conduct was objectively unreasonable in light of clearly established law, and the district court properly denied their motion for summary judgment with respect to the § 1985 claim.

We emphasize that the statute does not create liability for every adverse action taken against a witness after the witness testifies in a federal case.  In addition to the requirement that there be a cognizable injury to the witness or his property (discussed above), the statute itself contains another limiting principle: the conspirator must threaten or injure the witness "on account of his having so attended or testified"——that is, because of, and by reason of, a person's participation as a witness.  See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 13 (1963) (defining the phrase "on account of" to mean "for the sake of: by reason of: because of").[22]  The defendants have said that they

---

[22]    Our reading of the "on account of his having so attended or testified" language in § 1985 parallels the Supreme Court's interpretation of similar language in 18 U.S.C. § 241, the criminal counterpart to § 1985.  Section 241 criminalizes, inter alia, conspiracies to injure or intimidate a citizen in the free exercise and enjoyment of federal rights "because of [the

had concerns about the instructors' abilities and ethics. The district court found, however, that there was sufficient evidence for a jury to conclude that the defendants acted to punish the plaintiffs because they had testified against the police. In further proceedings in this case, the defendants may be able to resolve this factual dispute in their favor.

## VI. FIRST AMENDMENT CLAIM

Kinney and Hall claim that the defendants unlawfully retaliated against them for exercising their rights to free speech guaranteed by the First Amendment and made applicable to state actors by the Fourteenth Amendment. The district court evaluated the plaintiffs' claim according to the law governing First Amendment retaliation claims brought by public employees. See Kinney, 111 F. Supp. 2d at 837. Acknowledging that Kinney and Hall were not employees of the Police Officials, the district court noted that in Board of County Commissioners v. Umbehr, 518 U.S. 668 (1996), the Supreme Court held that the First Amendment analysis applicable to claims by public employees also applies to First Amendment claims brought by the government's independent contractors. Having considered the relationship between Kinney and Hall and the police agencies that have long used their

---

citizen's] having so exercised the same." Interpreting this language in United States v. Guest, 383 U.S. 745 (1966), the Court stated that § 241 would not reach every conspiracy that affected a federal right, but only a conspiracy whose "predominant purpose" was to deter or punish the exercise of the federal right. Id. at 760.

services, the district court concluded that Kinney and Hall are "the equivalent of . . . governmental independent contractor[s]." Kinney, 111 F. Supp. 2d at 841 (citing Umbehr, 518 U.S. at 674).

As the district court recognized, a First Amendment retaliation claim in the employment context has four elements: (1) the plaintiff suffered an adverse employment decision, (2) the plaintiff's speech involved a matter of public concern, (3) the plaintiff's interest in speaking outweighed the governmental defendant's interest in promoting efficiency, and (4) the protected speech motivated the defendant's conduct. See Lukan v. N. Forest ISD, 183 F.3d 342, 346 (5th Cir. 1999). The district court determined that Kinney and Hall had proffered sufficient evidence to withstand summary judgment on those elements. First, the district court found that both instructors presented evidence that they had suffered adverse employment actions by being forced to accept lower paying jobs as a result of the Police Officials' boycott. Kinney, 111 F. Supp. 2d at 838. Second, the court determined that the plaintiffs' testimony regarding the use of excessive force by police officers was unquestionably a matter of public concern. Id. Third, applying the balancing test set forth in Pickering v. Board of Education, 391 U.S. 563, 568 (1968), the district court determined that the balance weighed in favor of Kinney and Hall; that is, the instructors' interest in commenting on a matter of public concern outweighed the Police Officials' interest in promoting the efficient delivery of public

37

services.  <u>Kinney</u>, 111 F. Supp. 2d at 838.[23]  Fourth, the district court found that the instructors' speech motivated the Police Officials' actions.  <u>Id.</u>  Then, turning specifically to the question of qualified immunity, the court determined that the relevant law was clearly established at the time of the alleged violation and that the Police Officials' conduct was objectively unreasonable in light of that clearly established law.  <u>See id.</u> at 840-44.

As we noted in our analysis of the plaintiffs' § 1985 claims, the threshold issue in a qualified immunity inquiry is whether, taken in the light most favorable to the party asserting the injury, Kinney and Hall have shown that the Police Officials' conduct violated their constitutional rights.  <u>See</u> <u>Saucier</u>, 533 U.S. at 201.  Only if we determine that the plaintiffs' evidence shows a constitutional violation do we address the question whether "[t]he contours of the right [were] sufficiently clear

---

[23]    This balancing was of course informed by the district court's evaluation of the summary judgment evidence. Specifically, regarding the Police Officials' assertions that the instructors' speech threatened to disrupt the efficient provision of public services, the district court remarked as follows:

> There are genuine issues of fact remaining in this case as to whether the plaintiffs' expert testimony could legitimately cause any disruptions in the defendants' operations.  Moreover, it must be determined whether these disruptions, if any, were the result of a perceived "conflict of interest" or the "blackballing" of plaintiffs for turning against one of their own.

111 F. Supp. 2d at 843.

[at the time of the alleged violation] that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640. We begin, then, by asking whether the Police Officials' conduct amounts to a violation of the plaintiffs' right to free speech. This requires us first to identify the proper First Amendment analysis.

## A.    What is the applicable First Amendment analysis?

The First Amendment shields speech "not only [from] direct limitations . . . but also [from] adverse government action against . . . individual[s] because of [their speech]," including the denial of public benefits to punish individuals for their speech. Colson v. Grohman, 174 F.3d 498, 508 (5th Cir. 1999).

At the outset, the Police Officials contend that their conduct is not actionable under the First Amendment because their decisions on whether and where to enroll officers are discretionary in the sense that no contract required them to enroll their officers in Kinney's and Hall's courses. This assertion overlooks the fundamental point that governmental discretion is always constrained by the Constitution. As the Supreme Court stated in Perry v. Sindermann, the locus classicus of the "unconstitutional conditions" doctrine:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that

39

> infringes his constitutionally protected interests—
> especially, his interest in freedom of speech.

408 U.S. 593, 597 (1972). The county officials in Umbehr were under no duty to place contracts with the plaintiff's trash-hauling business, nor did the plaintiff have a right to those contracts; it was an at-will relationship. See Umbehr, 518 U.S. at 670-71. The point of such cases, as we have long made plain, is the government's duty not to punish protected speech, not the citizen's supposed "right" to government patronage.[24] In the instant case, the district court found sufficient evidence not only that the defendants deprived Kinney and Hall of the benefit of continued enrollment in their courses—a form of public patronage—but also that at least some of the defendants sought to have the instructors removed from the academy altogether. That no contract forbade this is irrelevant.

The Police Officials also suggest that their relationship with Kinney and Hall was too attenuated to create the requisite governmental power over the instructors. Specifically, the Police Officials argue that their conduct did not deny Kinney and

_____

[24] See N. Miss. Communications, Inc. v. Jones, 792 F.2d 1330, 1337 (5th Cir. 1986) ("Although the [plaintiff newspaper] may have had no 'right' to receive certain legal advertising from the County Board of Supervisors, it would violate the Constitution for the Board to withhold public patronage, in the form of its advertising, from the [newspaper] in retaliation for that newspaper's exercise of first amendment rights, or, in similar reprisal to threaten commercial advertisers with a loss of county business should they continue to advertise in the [newspaper].").

40

Hall the benefit of employment because Kilgore College, and not the Police Officials, held the authority to refuse to renew Kinney's and Hall's contracts. We reject this line of argument. The Supreme Court has made it clear that First Amendment protection does not depend on whether the governmental action at issue is "direct" or "indirect." To hold that the Police Officials' conduct cannot constitute a First Amendment violation because they did not directly deprive Kinney and Hall of their jobs, but instead used governmental power to exert economic pressure on the instructors' employer in order to achieve that same result, "would allow the government to 'produce a result which [it] could not command directly.'" <u>Perry</u>, 408 U.S. at 597 (quoting <u>Speiser v. Randall</u>, 357 U.S. 513, 526 (1958)) (alteration in original). The defendants' "attenuation" argument is fundamentally misguided, for the situation in which the economic relationship between the government and the speaker is the most attenuated would be the case in which the speaker is an ordinary citizen with no employment-related ties to the government. In this limiting case for the defendants' attenuation argument, the First Amendment would plainly forbid the government from pressuring the citizen's employer to fire the citizen as punishment for trial testimony that the government disliked. The degree of attenuation present in a given case may well bear on causation—that is, it may be easier for a government official to fire his own employee than to persuade a

41

contractor to fire one of its employees—but this does not change the official's First Amendment duty.  We thus reject the defendants' initial arguments that the First Amendment has no bearing on this case.

While all citizens enjoy the protections of the First Amendment, the appropriate analytical framework for applying the "unconstitutional conditions" doctrine to a given First Amendment claim depends on the context in which the claim arose.  As the Supreme Court explained in Umbehr, the cases form a "spectrum" ranging from, at one end, cases involving "government employees, whose close relationship with the government requires a balancing of important free speech and government interests" and, on the other end, cases involving "ordinary citizens whose viewpoints on matters of public concern the government has no legitimate interest in repressing."  518 U.S. at 680.

Because the government has no legitimate interest in denying a benefit to "ordinary citizens" on account of their speech on matters of public concern, there is no interest balancing involved in the First Amendment analysis for "ordinary citizen" cases.  Rather, the First Amendment is violated in "ordinary citizen" cases if the individual engaged in conduct protected by the First Amendment and the government took action against the person because of that protected conduct.  See, e.g., Rolf v. City of San Antonio, 77 F.3d 823, 827 (5th Cir. 1996).  In

42

"governmental employee" cases, by contrast, courts must be attentive to the "[t]he government's interest in achieving its goals as effectively and efficiently as possible," which interest "is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." Waters v. Churchill, 511 U.S. 661, 675 (1994) (plurality opinion).

The Supreme Court set out the basic analytical structure for "governmental employee" balancing cases in Pickering v. Board of Education, 391 U.S. at 568. In that case, the Court held that a board of education violated a teacher's First Amendment rights by discharging him in retaliation for his criticism of the board's budget decisions. Id. at 566, 574-75. In so holding, the Court emphasized that government employees "may [not] constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public [institutions] in which they work." Id. at 567-68. The Court also recognized, however, that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Id. Thus, explained the Court, it is necessary "to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the

43

State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 568.

In Umbehr and its companion case, O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712 (1996), the Supreme Court held that the "governmental employee" version of the unconstitutional conditions doctrine——that is, the Pickering balancing inquiry——is also appropriate where an independent contractor alleges a First Amendment violation against the government. See O'Hare Truck Serv., 518 U.S. at 720-24; Umbehr, 518 U.S. at 677-78, 684-85. The Court reasoned that "[i]ndependent government contractors are similar in most relevant respects to government employees." Umbehr, 518 U.S. at 684. Specifically, the Court noted:

> The government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption. And, absent contractual, statutory, or constitutional restriction, the government is entitled to terminate them for no reason at all. But either type of relationship provides a valuable financial benefit, the threat of the loss of which in retaliation for speech may chill speech on matters of public concern by those who, because of their dealings with the government, "are often in the best position to know what ails the agencies for which they work."

Id. at 674 (quoting Waters, 511 U.S. at 674).[25]

_____

[25] Based on reasoning similar to that of the Supreme Court in Umbehr and O'Hare Truck Service, this court has also applied a Pickering balancing test in First Amendment retaliation cases arising outside the public employment context. See, e.g., Copsey v. Swearingen, 36 F.3d 1336, 1344 (5th Cir. 1994) (holding that a Pickering balancing analysis was the appropriate framework for evaluating a vending stand operator's First Amendment claim based on a state agency's revocation of his license after he publicly

As we have explained in past cases, the determination whether the relationship between the government and an individual falls on the "governmental employee" end of the Umbehr spectrum turns on whether the relationship is sufficiently "analogous to an employment relationship." See Blackburn v. City of Marshall, 42 F.3d 925, 932 (5th Cir. 1995). Applying this standard in Blackburn, we held that the Pickering balancing test was not applicable to a wrecker service owner's First Amendment retaliation claim against police officials for revoking his permission to use the police radio frequency after he criticized the police department's contracting procedures. Id. at 930, 934. The revocation of radio privileges rendered the service unable to participate in a rotation system for removing damaged vehicles from the scenes of accidents. Id. at 930. We reasoned in Blackburn that the business relationship between the wrecker service owner and the police department did not implicate employment-type ties but was instead similar to the relationship between the parties in North Mississippi Communications, another case in which we applied the "ordinary citizen" version of the "unconstitutional conditions" doctrine. See Blackburn, 42 F.3d at 934. North Mississippi Communications involved a newspaper's

criticized the licensing program); Caine v. Hardy, 943 F.2d 1406, 1415-16 (5th Cir. 1991) (en banc) (treating an anesthesiologist with clinical privileges at a public hospital as a "public employee" for purposes of his First Amendment claim based on the hospital's permanent suspension of his clinical privileges after he opposed a proposal made by the chief of anesthesiology).

45

First Amendment claim alleging that county officials had ceased placing legal notices in the newspaper in retaliation for the newspaper's publication of editorials that criticized the board and its members.  792 F.2d at 1337.  We did not apply a Pickering balancing test to the newspaper's First Amendment claim, but rather held that "it would violate the Constitution for the Board to withhold public patronage, in the form of its advertising, . . . in retaliation for that newspaper's exercise of first amendment rights."  Id.

The parties in this case disagree over which First Amendment analysis——Pickering balancing on the one hand or the "ordinary citizen" framework on the other——should apply to this case. Earlier, in arguing that their actions did not deny Kinney and Hall any actionable "benefits" for purposes of the unconstitutional conditions doctrine, the Police Officials emphasized their lack of employment-type ties to Kinney and Hall. In support of their argument regarding the appropriate First Amendment analysis, however, the Police Officials now characterize their relationship with the ETPA and ETPA instructors as sufficiently akin to employment to warrant a balancing of the Police Officials' interests against the free speech interests at stake in this case.  Relying on North Mississippi Communications and Worrell v. Henry, 219 F.3d 1197 (10th Cir. 2000), Kinney and Hall respond that the "ordinary citizen" analysis is better suited to the circumstances of the

46

instant case than is the "governmental employee" test.  In Worrell, the Tenth Circuit declined to apply a Pickering balancing test to a First Amendment claim alleging that the law enforcement defendant pressured the plaintiff's employer to rescind the plaintiff's job offer in retaliation for the plaintiff's having testified as an expert witness on behalf of a criminal defendant.  See 219 F.3d at 1202, 1209-12.  Rather, the Worrell court determined that the appropriate First Amendment analysis for evaluating the plaintiff's claim was the "ordinary citizen" version of the unconstitutional conditions doctrine.  See id. at 1212-13.

We agree with the district court and the Police Officials that a Pickering balancing analysis is appropriate in this case.  The relationship between the Police Officials and ETPA instructors such as Kinney and Hall implicates governmental interests similar to those involved in the public employment context.  Law enforcement agencies have a legitimate interest in exercising discretion over the choice of the instructors who train the officers who will, in turn, carry out the agencies' public duties.  Those interests include, for example, ensuring that the instructors are competent and knowledgeable, that they are adept at conveying that knowledge to officer-students, and that they maintain a good working relationship with law enforcement agency officials so that those officials can monitor the training that their officers receive.  These interests are

47

all relevant to the ultimate governmental interest that the Pickering balancing analysis is meant to protect, namely the interest "in promoting the efficiency of the public services [a law enforcement agency] performs." Pickering, 391 U.S. at 568.

The defendants do not dispute that the instructors spoke on a matter of public concern, nor can they question (in this interlocutory appeal) the district court's factual determinations regarding causation. Accordingly, we now consider whether, under Pickering, the district court correctly balanced the First Amendment interest in protecting Kinney's and Hall's speech against the Police Officials' interests in suppressing it.

**B.  Was there a First Amendment violation?**

The Pickering test requires us to balance the speaker's First Amendment interests against the government's legitimate interests in the efficient provision of public services. In performing this balance, we must take care not to exceed the scope of our interlocutory appellate jurisdiction. As explained earlier, see supra Parts II-III, we must accept the existence of those genuine issues of fact identified by the district court and the district court's concomitant characterization of the plaintiffs' summary judgment evidence. The question for us is whether the district court committed legal error in balancing the interests supported by the summary judgment record, viewing the record in the light most favorable to the non-movants.

48

Starting first with the plaintiffs' side of the scales, we conclude that Kinney and Hall present an extremely strong First Amendment interest. The weight of the First Amendment interest is, of course, not measured solely by the instructors' own personal gain, if any, from speaking.[26] It is, rather, a function of the social value of that speech. See, e.g., Connick v. Myers, 461 U.S. 138, 145 (1983) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.") (alteration in original) (internal quotation marks and citation omitted); Brawner v. City of Richardson, 855 F.2d 187, 192 (5th Cir. 1988) (discussing, in the course of a Pickering balancing case, "the public's interest in the disclosure of misconduct or malfeasance" (emphasis added)). This court has emphasized the great First Amendment significance of speech bearing on official misconduct, "especially when it concerns the operation of a police department." Brawner, 855 F.2d at 191-92. Indeed, because individuals working in law enforcement "are often in the best position to know" about the

---

[26] Contrary to some of the Police Officials' intimations, the plaintiffs' interests in speaking cannot be reduced to a mere pecuniary interest in, as the defendants put it, "moonlighting as experts-for-hire." The plaintiffs originally planned to be paid for their work in the Kerrville shooting case—just as Kinney had been paid in the past when he had testified as an expert in support of police officers—but they later decided that "it wouldn't be right to charge" because they "felt so strongly about the incident." As we explain in the text, the speech in this case is uncommonly valuable because of the public's interest in identifying, preventing, and remedying official misconduct, not because of any personal advantage to Kinney and Hall.

occurrence of official misconduct, <u>Umbehr</u>, 518 U.S. at 674, "it is essential" that such well-placed individuals "be able to speak out freely" about official misconduct, <u>Pickering</u>, 391 U.S. at 572. Kinney and Hall, two experienced law enforcement trainers with expertise in weapons and the use of force, are ideally placed to offer valuable public comment about excessive force and the adequacy of police training and supervision, the key issues in the Kerrville trial.[27] Moreover, as the district court pointed out, "[i]ndividuals will have a hard time succeeding in an excessive force case without the assistance of experts who are intimately acquainted with police procedures." <u>Kinney</u>, 111 F. Supp. 2d at 838. Expert testimony is thus essential both in providing victims with "the only realistic avenue for vindication of constitutional guarantees," <u>Harlow</u>, 457 U.S. at 814, as well as in serving § 1983's parallel deterrent function, <u>see</u> <u>Owen v. City of Independence</u>, 445 U.S. 622, 651 (1980). We thus conclude

---

[27] The fact that Kinney and Hall spoke as expert witnesses does not mean that their speech was less valuable than other forms of speech that reveals official misconduct. By virtue of their experience and expertise, witnesses like Kinney and Hall play an essential role in identifying police misconduct. There was no secret about the fact that Eddie Gonzales had been shot by the police in Kerrville; the public did not need an expert witness to reveal that. The public does need experts like Kinney and Hall, however, to reveal whether the shooting was an unjustified use of force or the result of inadequate training or supervision.

that Kinney and Hall have a particularly weighty First Amendment interest on their side of the Pickering scales.[28]

We turn next to the Police Officials' side of the Pickering balance.  Stated in its most general terms, the government has an interest in "promoting the efficiency of the public services [that the governmental agency] performs."  Pickering, 391 U.S. at 568.  In the instant case, given the Police Officials' objective of providing effective law enforcement, all sides recognize that they have a strong interest in assuring the effective training of their law enforcement personnel.  As the Supreme Court has made clear, however, the relevant issue is not the weight of the governmental interest considered in abstract terms; we look instead to how the speech at issue affects the government's interest in providing services efficiently.  It is the speech's detrimental effect on the efficient delivery of public services that gives the government a legitimate interest in suppressing it.  This is illustrated, for example, by Rankin v. McPherson, 483 U.S. 378, 381 (1987), a case in which an employee in a constable's office remarked, upon hearing about the attempted

---

[28]     Judge Jones would minimize the importance of the free speech interest at stake here on the ground that Kinney and Hall testified voluntarily.  (Kinney and Hall were actually subpoenaed, but they admit that they appeared voluntarily.)  In doing so, she relies on the Third Circuit's decision in Green v. Philadelphia Housing Authority, 105 F.3d 882 (3d Cir. 1997).  The plaintiff in Green was demoted after he agreed to testify, as a favor for a friend, as a character witness at the friend's son's bail hearing.  Id. at 884.  Such testimony is of much less public importance than the testimony here.

assassination of President Reagan, "[I]f they go for him again, I hope they get him." The Rankin Court did not consider the defendant constable's generalized interest in maintaining discipline——certainly an important interest——but the Court instead asked whether the speech at issue, given the context and the employee's duties, actually impaired office operations. "In performing the [Pickering] balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." Id. at 388. Thus, the question in this case is not whether the police have an interest in "effective training"——no one would deny that——but rather whether, on this record, they could reasonably think that interest threatened by the plaintiffs' protected speech such that the Police Officials may legitimately suppress that speech.

In recognizing that the governmental interests at stake in a particular case necessarily depend upon the facts of the case, we most certainly do not, as the dissent asserts, pervert the First Amendment analysis by changing the Pickering balancing inquiry into a question for the jury. It is for the court to determine the importance of a plaintiff's speech interest, to determine the importance of a governmental interest in efficient operations, and to balance the relative weight of each. But the governmental interests that are at stake in a particular case necessarily depend on the facts of the case. As a matter of law, the Police

52

Officials surely have an array of weighty interests in various matters, but those interests are only relevant to this case if, as a matter of fact, a certain interest is threatened. In this case——an interlocutory appeal of a denial of summary judgment——we are not permitted to indulge in our own preferred view as to the true facts of the case, much less can we simply accept the defendant's version of the disputed facts as true. Instead, we must accept the genuine factual disputes identified by the district court and conduct the inquiry as if the plaintiffs' version is true. That is how this circuit, like other circuits, handles the substantive law of <u>Pickering</u> balancing in the procedural posture of summary judgment when the material facts are disputed. <u>See, e.g.</u>, <u>Victor v. McElveen</u>, 150 F.3d 451, 457 (5th Cir. 1998) (explaining that a sheriff was unable to show that his interests in efficient functioning of the department outweighed a deputy's speech interests, given that it was disputed whether the comment was disruptive).[29] The dissent is

---

[29] <u>See also</u> <u>Johnson v. Ganim</u>, 342 F.3d 105, 114-15 (2d Cir. 2003) (denying summary judgment and qualified immunity because of factual dispute regarding whether plaintiff's speech reasonably could disrupt the government employer's operations); <u>Gustafson v. Jones</u>, 290 F.3d 895, 909 (7th Cir. 2002) ("<u>Pickering</u> balancing is not an exercise in judicial speculation. While it is true that in some cases the undisputed facts on summary judgment permit the resolution of a claim without a trial, that means only that the <u>Pickering</u> elements are assessed in light of a record free from material factual disputes."); <u>Domina v. Van Pelt</u>, 235 F.3d 1091, 1098-99 (8th Cir. 2000) (denying summary judgment and qualified immunity due to factual dispute over whether employee's speech created workplace disharmony and affected morale); <u>Johnson v. Univ. of Cincinnati</u>, 215 F.3d 561,

thus incorrect if it suggests that First Amendment cases present an exception to the general rule that we do not resolve genuine factual disputes at the summary judgment stage. Put differently, engaging in Pickering balancing is not like performing rational basis review, where we uphold government action as long as there is some imaginable legitimate basis for it. Gustafson, 290 F.3d at 909-10; see Boddie v. City of Columbus, 989 F.2d 745 (5th Cir. 1993) ("There was no interest to balance [in the Pickering inquiry] when this [potential] reason was rejected factually."). We do not let the governmental defendant prevail, on summary judgment, by relying on interests that, viewing the record in the non-movant's favor, are not reasonably threatened in the case.

With these principles in mind, we now turn to the Police Officials' asserted grounds for taking action against Kinney and Hall. In canvassing the possible harms caused by the plaintiffs' Kerrville testimony, we note first that some of the workplace disruptions cited by the Police Officials are simply irrelevant to the Pickering calculus. It is of course true, as the defendants point out, that the boycott strained the relationship between the ETPA and the local police agencies. In addition, the boycott may have caused tension between Holda and the plaintiffs,

---

585 (6th Cir. 2000) (reversing grant of summary judgment because material factual disputes bore on Pickering balance); cf. Shands v. City of Kennett, 993 F.2d 1337, 1342-43 (8th Cir. 1993) (instructing district courts to submit special interrogatories to the jury on the question of whether the employee's speech was disruptive).

although Holda did defend Kinney and Hall in the media and attempt to resolve the boycott amicably. Those types of disruptions might have given the ETPA a sound reason for taking action against Kinney and Hall, but they cannot be counted in the Police Officials' favor. The disruptions just noted were caused by the Police Officials' boycott, so the Police Officials can hardly rely on those disruptions as a justification for their boycott. The question is whether the plaintiffs' testimony posed a threat to the Police Officials' ability to deliver police services, not whether the Police Officials caused a disruption in response to it.[30]

With regard to the question whether the plaintiffs' speech impaired the Police Officials' training operations, the district court concluded, based upon its review of the record before it, that the defendants had not identified any damage to the efficiency of their operations brought about by Kinney's and

---

[30] Cf. Kennedy v. Tangipahoa Parish Library Bd. of Control, 224 F.3d 359, 378 n.19 (5th Cir. 2000). Other courts have likewise rejected the circular argument advanced by the Police Officials. See Worrell, 219 F.3d at 1210-11 ("[A]cting with retaliatory intent, a third party upon whose cooperation the employer depended could refuse to cooperate with the employer unless a particular employee were fired, demoted, or transferred. By withholding cooperation, the third party could effectively create the very workplace disruption that, under the Pickering approach, could be used to justify the limitation of First Amendment rights."); cf. Hughes v. Whitmer, 714 F.2d 1407, 1434 (8th Cir. 1983) (McMillian, J., dissenting) ("It would be anserine to permit the government to discipline its employees because of disruption caused by the government's repressive reaction to the employee's first amendment activities.").

Hall's testimony in Kerrville.  Kinney, 111 F. Supp. 2d at 842.

This finding is not itself determinative, for we (like those in

dissent) are mindful of the fact that a prudent administrator

will often wish to take action before a risk ripens into an

actual workplace disruption.  The key limitation on preemptive

action, however, is that the officials' predictions of disruption

must be reasonable.  See Waters, 511 U.S. at 673; Connick, 461

U.S. at 154; Brawner, 855 F.2d at 192 (asking whether speech was

"likely" to disrupt police department's operations); see also

Gustafson, 290 F.3d at 911 (denying police officials' request for

qualified immunity and remarking that "mere incantation of the

phrase 'internal harmony in the workplace' is not enough to carry

the day" (internal quotation marks omitted)).  "Even in

situations where courts have recognized the special expertise and

special needs of certain decisionmakers, the deference to their

conclusions has never been complete."  Waters, 511 U.S. at 677.

The reason for this rule should be obvious: Disruption is always

possible, but to give deference to unfounded predictions of harm

would allow the government arbitrarily to punish speech under the

guise of preempting disruption.  That is, it would permit the

government "to silence discourse, not because it hampers public

functions but simply because superiors disagree with the content

of employees' speech," Rankin, 483 U.S. at 384.  The district

court addressed the issue of whether disruption was a reasonable

prospect, and its conclusion was that "[t]here are genuine issues

56

of fact remaining in this case as to whether the plaintiffs'

expert testimony could legitimately cause any disruptions in the

defendants' operations."  Kinney, 111 F. Supp. 2d at 843.[31]  We

are not free to disregard that conclusion in this appeal.

The Police Officials claim that Kinney's and Hall's

testimony damaged training by creating a "conflict of interest"

and "violat[ing] . . . principles of cooperative responsibility

[and] trust."  Needless to say, reasonable officials should be

concerned about conflicts of interest, and they can rightfully

demand that their employees and contractors not abuse the trust

the government places in them.  Based upon the summary judgment

record, however, the district court was unable to determine

whether the Police Officials had concerns about genuine conflicts

of interest or were instead, as Kinney and Hall contend, merely

interested in enforcing a "code of silence" against the

plaintiffs.  Id. at 835, 838, 843.[32]  One of the main reasons for

_____

[31]    In this regard, it should be remembered that the record
does not contain any affidavits or depositions from trainees who
stated that they lost confidence in the instructors.  Kinney and
Hall stated that their relationships with students were not
adversely affected.

[32]    The so-called "code of silence," as we have explained
in previous cases, is the informal rule according to which one
police officer does not report on or testify against another
police officer, regardless of the nature of the accused officer's
conduct.  See, e.g., Snyder v. Trepagnier, 142 F.3d 791, 797 n.6
(5th Cir. 1998) (citing an expert witness).
    The Police Officials have asserted in their briefs that
Kinney and Hall admitted that the Police Officials had genuine
and reasonable concerns about conflicts of interest.  We do not
believe that the Police Officials' reading of the record is

57

the district court's conclusion was that the Police Officials have asserted an interest in suppressing testimony that involved a police agency hundreds of miles away, well outside of the ETPA's service area. The record shows that the Police Officials see a conflict of interest whenever and wherever a police trainer testifies against police officers. Regardless of whether one uses the label "code of silence," we believe that, on this record, the defendants' asserted notion of "conflicts of interest" sweeps so broadly as to undermine its status as a legitimate government interest that can properly weigh in the Pickering balance.[33] The persuasiveness of the Police Officials' asserted concern sinks further still when one considers that they not only refused to send students to Kinney's and Hall's classes—that might be a proper response to concerns about an instructor—but the Police Officials also tried to have the instructors fired, which tends to imply that the defendants were

warranted. In their depositions, Kinney and Hall admitted that reasonable people could be concerned about conflicts of interest when an instructor testifies against his own students. They deny, however, that reasonable people would be concerned about conflicts of interest in this case, and they deny that the Police Officials held genuine concerns about conflicts.

[33] The Pickering balance takes account of legitimate interests only. See Umbehr, 518 U.S. at 675 (referring to "legitimate countervailing government interests") (emphasis added); Wilson v. UT Health Ctr., 973 F.2d 1263, 1270 (5th Cir. 1992) ("Though the speech of public employees may be of public concern, that speech still does not enjoy First Amendment protection if legitimate government interests in limiting the speech outweigh the employees' interest in speaking.") (emphasis added).

trying to do more than prevent a conflict of interest.  If

anything, the Police Officials' sweeping (yet one-sided) notion

of "conflicts of interest" tends to impair the efficient

provision of public services, inasmuch as it thwarts the

important public objective of preventing police misconduct.[34]  As

the Supreme Court counseled in Rankin, another case that arose in

the law enforcement context, "[v]igilance is necessary to ensure

that public employers do not use authority over employees to

silence discourse, not because it hampers public functions but

simply because superiors disagree with the content of employees'

speech."  483 U.S. at 384.

Similar comments are in order regarding the Police

Officials' asserted interests in loyalty and esprit de corps,

heavily relied upon by the dissent.  No one would doubt but that

those are important considerations, especially in a police

department.  Even within a police department, however, the mere

---

[34]    As this court has recognized, government agencies have
an interest in protecting speech relating to official misconduct,
and there are circumstances in which that interest
counterbalances the governmental interest in suppressing
disruptive speech.  See Victor, 150 F.3d at 457 (observing, in
connection with a deputy sheriff's First Amendment claim, that
"concerns about maintaining harmony and eliminating disruption
cannot be the sole measure of government interest when the
employee's speech furthers other important state interests");
Frazier v. King, 873 F.2d 820, 826 (5th Cir. 1989) (stating, in a
First Amendment case brought by a nurse who worked in a prison,
that "[a]lthough [the plaintiff's] 'whistle blowing' obviously
created tension and difficulties at [the prison], when weighed
against the exposure of unethical medical practices affecting
hundreds of inmates, the disruption is a minimal interest").

assertion of interests in preserving loyalty and close working relationships does not end the debate as it would if this were a rational basis inquiry. See Branton v. City of Dallas, 272 F.3d 730, 741 (5th Cir. 2001). When the dissent trumpets the need for "institutional loyalty," Jones dissent at 35, one must ask what institution the plaintiffs have wronged by testifying against distant officers that they have never met. The Police Officials' charge of disloyalty makes sense only if Kinney and Hall owe fealty to law enforcement universally. Indeed, the Police Officials' stated view is that one is disloyal——and has committed an unforgivable "sin"——whenever one testifies against law enforcement officers anywhere. A concept of loyalty that sweeps so broadly is not one that may legitimately trump compelling interests in speaking on matters of public concern.

The district court's conclusions with respect to the question of workplace disruption——or rather, the absence thereof——distinguish the instant case from a case like Tedder v. Norman, 167 F.3d 1213 (8th Cir. 1999). In Tedder, the deputy director of a police academy testified as an expert witness against one of the agencies that sent trainees to the academy. It is quite understandable how this could raise real concerns, including concerns about conflicts of interest. Accordingly, the Tedder court found that the "actual disruption and potential further disruption" caused by the plaintiff's testimony justified the academy's decision to demote him. Id. at 1215. Here, in

60

contrast, the district court concluded that there was a genuine dispute over whether the plaintiffs' activities did in fact, and reasonably could be expected to, impair proper training.

When we accept the factual disputes identified by the district court and view the disputed facts in the light most favorable to Kinney and Hall, we find that the Police Officials have not articulated any relevant, cognizable interests in suppressing the plaintiffs' speech, while Kinney and Hall have presented a strong First Amendment interest in testifying about police brutality and inadequate supervision and training. Therefore, we conclude that, at the summary judgment stage, the instructors' interest in testifying easily outweighs the Police Officials' interest in suppressing their speech, given that the speech involved unrelated police agencies hundreds of miles away.

Our decision should not be taken to mean that police agencies do not enjoy broad latitude in managing the training of their officers, including significant discretion over the choice of instructors. There are any number of legitimate reasons why police officials can stop using a particular instructor or academy; barring contractual commitments, they can do so for no good reason at all. In order to do so on a basis that penalizes protected speech, however, they must explain why their need to suppress the speech outweighs the countervailing First Amendment interest in free expression. At this early stage of the proceedings, there is a genuine dispute as to whether the Police

61

Officials had any legitimate interests that could justify their decision to boycott and seek the termination of instructors who had testified in a distant trial against unrelated police agencies.

To summarize: Kinney and Hall spoke on a matter of public concern, and the value of their speech prevails, at the summary judgment stage, over the opposing governmental interests in the Pickering balance. Since the district court also found that Kinney and Hall established a genuine factual issue regarding whether the Police Officials boycotted Kinney's and Hall's courses and sought to have them removed from the ETPA faculty because of their testimony, Kinney, 111 F. Supp. 2d at 838, 843, the facts set forth by Kinney and Hall are sufficient to state a First Amendment violation. The first step of the qualified immunity analysis is thus complete. We next turn to the question of "clearly established" law——that is, whether it would have been apparent to a reasonable officer at the time of the alleged violation that the Police Officials' conduct violated the First Amendment.

C. Are the Police Officials entitled to qualified immunity?

The First Amendment right to free speech was of course clearly established in general terms long before the events giving rise to this case. In order to defeat the Police Officials' claim of qualified immunity, however, Kinney and Hall

62

must show that "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson, 483 U.S. at 640. Qualified immunity should not be denied unless the law is such that reasonable officials should be "on notice [that] their conduct is unlawful."  Saucier, 533 U.S. at 206.  It bears repeating once more that our factual guide is the district court's view of the record, and the legal question is whether the defendants' conduct violated clearly established law measured against the facts that the district court believed the plaintiffs could prove at trial.  See Behrens, 516 U.S. at 313.

There is no question that it was clearly established well before October 1998 that Kinney's and Hall's testimony was of public concern and thus was speech protected by the First Amendment.[35]  The Police Officials do not attempt to argue otherwise, but rather suggest that it was not clear that the First Amendment imposed any restrictions on their conduct vis-à-vis Kinney and Hall as their training instructors.  This, of course, is the same argument we rejected earlier, in discussing whether Kinney and Hall had set forth evidence of

_____

[35]     Testimony in judicial proceedings "is inherently of public concern."  Johnston v. Harris County Flood Control Dist., 869 F.2d 1565, 1578 (5th Cir. 1989); see also Reeves v. Claiborne County Bd. of Educ., 828 F.2d 1096, 1100 (5th Cir. 1987) (testimony in civil proceedings); Smith v. Hightower, 693 F.2d 359, 368 (5th Cir. 1982) (testimony in criminal proceedings); Rainey v. Jackson State Coll., 481 F.2d 347, 349-50 (5th Cir. 1973) (testimony of expert witness).

63

conduct that would amount to a constitutional violation at all.
In arguing for qualified immunity, the Police Officials contend
that there was at least a reasonable legal basis for their view,
even if it was ultimately wrong.  More specifically, the Police
Officials say that their duties with respect to Kinney and Hall
were unclear because the instructors were "employees of a
'disappointed bidder'──i.e., Kilgore College."  The Police
Officials apparently base this contention in part on the Umbehr
Court's admonishment that "[b]ecause [this] suit concerns the
termination of a pre-existing commercial relationship with the
government, we need not address the possibility of suits by
bidders or applicants for new government contracts who cannot
rely on such a relationship."  518 U.S. at 685.

Initially, we reject the defendants' attempt to characterize
Kinney and Hall as employees of a disappointed bidder.  Neither
Kilgore College nor ETPA instructors such as Kinney and Hall were
mere "bidders" in the sense that they lacked a "pre-existing
commercial relationship" of the sort that the Court was concerned
about in Umbehr──i.e., a relationship that the Police Officials
could use to inhibit speech.  See id. at 674 (reasoning that a
Pickering balancing analysis is appropriate in cases involving
the government's independent contractors or providers of regular
services as well as its employees because both "type[s] of
relationship provide[] a valuable financial benefit, the threat
of the loss of which in retaliation for speech may chill speech

64

on matters of public concern"). The Police Officials had the power to deny Kinney and Hall significant benefits as ETPA instructors, and it is the existence of that sort of power——and not mere labels describing governmental relationships——that is relevant for purposes of the First Amendment. See O'Hare Truck Serv., 518 U.S. at 721-22; Umbehr, 518 U.S. at 678-79.

More fundamentally, we reject the Police Officials' suggestion that it would have been reasonable for officers in their positions to believe that they were unfettered by the First Amendment merely because their economic relationship with Kinney and Hall was non-employment and non-contractual. Both the Supreme Court and this court have explicitly rejected such reasoning. In O'Hare Truck Service, the Court rejected "the proposition . . . that those who perform the government's work outside the formal employment relationship are subject to what we conclude is the direct and specific abridgment of First Amendment rights." 518 U.S. at 720. Similarly, in Blackburn, we stated that the "assumption that only public employees enjoy the protections of the First Amendment" rested on "inverted" reasoning because "[e]very citizen enjoys the First Amendment's protections against governmental interference with free speech." 42 F.3d at 931. As we explained in Blackburn, the Supreme Court did not formulate the "governmental employee" version of the "unconstitutional conditions" doctrine in order to limit the First Amendment to the public employment context, but rather in

65

order to take into account that "the First Amendment rights of public employees are restricted by the nature of the employer-employee relationship." Id. Indeed, the Supreme Court's decisions in Pickering, Umbehr, and O'Hare Truck Service are predicated on the assumption that although the government may have other relationships with individuals in addition to the citizen-sovereign relationship, individuals do not, as a result of such relationships, cease to be citizens with First Amendment rights that the government is obligated to respect. Thus, we have little difficulty concluding that the Police Officials would be unreasonable in failing to recognize that they had First Amendment obligations toward Kinney and Hall.

Part VI.A of this opinion determined that the Police Officials were entitled to have the plaintiffs' First Amendment claim analyzed under a Pickering balancing inquiry, a framework that recognizes the Police Officials' legitimate interests in suppressing some speech that interferes with the provision of public services. To the extent that there was any uncertainty about the proper analytical framework, the uncertainty could not redound to the defendants' benefit, as the alternative would have been to hold the Police Officials to the higher standards that they must observe with respect to ordinary citizens. It is plain that the government cannot harry the employer of an ordinary citizen who gave unwelcome testimony, seeking to have the employee fired in retaliation. Giving the Police Officials the

benefit of the <u>Pickering</u> balancing test, we must ask whether it was clearly established at the time of the Police Officials' conduct that the First Amendment forbade them from retaliating against Kinney and Hall, the employees of their contractor, on account of the instructors' Kerrville testimony.  We conclude that it was.

Given that it is well-established in the jurisprudence of both the Supreme Court and this court that official misconduct is of great First Amendment significance, and that this court has repeatedly emphasized the need to protect speech regarding police misconduct in particular, <u>see, e.g.</u>, <u>Brawner</u>, 855 F.2d at 192, it would have been objectively unreasonable for an officer to conclude that Kinney's and Hall's testimony was anything other than highly valuable speech.[36]  Suppressing that speech could be justified, they should have realized, only by a weighty governmental interest.  <u>See</u> <u>Matherne v. Wilson</u>, 851 F.2d 752, 761 (5th Cir. 1988) (explaining that a greater disruption must be shown when the speech is of greater public concern).

As explained earlier, at this stage of the case it is disputed whether the Police Officials' legitimate interests were threatened by Kinney and Hall.  The district court found that it was disputed whether the instructors' testimony in Kerrville

---

[36]    As we explained earlier, that Kinney and Hall testified as experts rather than as fact witnesses does not mean that their speech fell outside of this particularly protected category.  <u>See</u> <u>supra</u> notes 26-27 and accompanying text.

67

disrupted, and even legitimately could disrupt, the Police Officials' training objectives.  <u>Kinney</u>, 111 F. Supp. 2d at 843.  On this record, the Police Officials' asserted interest in loyalty is unreasonable given the events at issue; certainly such interests cannot justify an attempt to force the instructors out of the academy altogether.  Viewing the summary judgment facts in the light most favorable to the non-movants, the Police Officials pursued Kinney and Hall not because of genuine conflicts of interest but instead merely because Kinney and Hall had testified against a police officer.  <u>Id.</u> at 838-39, 843, 845.  When the disputed facts are viewed from the perspective of the plaintiffs' evidence—and that is the only perspective allowed on this interlocutory appeal, <u>see</u> <u>Behrens</u>, 516 U.S. at 313—the illegality of the Police Officials' actions is readily apparent.  Summary judgment is therefore inappropriate.

The Police Officials contend that their conduct was reasonable in light of the fact that, when the boycott started in October 1998, the Texas Legislature and Texas A&M University had enacted policies that effectively prohibited state employees from serving as expert witnesses against the state, ostensibly because of inherent conflicts of interest.  <u>See</u> <u>Hoover v. Morales</u>, 164 F.3d 221, 223-24 (5th Cir. 1998) (describing the policies).  But the Police Officials could hardly have reasonably relied on these state policies as support for their own stand against purported conflicts of interest: The state policies had been challenged as

violative of free speech, and a federal judge had preliminarily

enjoined their enforcement on August 7, 1997, over a year before

the boycott.  This court affirmed that decision in an opinion

issued July 23, 1998.[37]  It would therefore have been

unreasonable to rely on these state policies for guidance on the

meaning of the First Amendment.

In any event, we had spoken to such issues long before the

controversy over the policies at issue in Hoover.  For example,

we held in Rainey v. Jackson State College that a teacher stated

a claim under the First Amendment when a state college denied him

_____

[37]     The defendants have stated that Hoover was not decided
until December 1998, after much (but by no means all) of the
conduct at issue in this case.  Their belief is probably based on
the fact that the version of the Hoover opinion printed in the
bound volume of the Federal Reporter 3d bears a date of Dec. 31,
1998.  The July version of the opinion was published at 146 F.3d
304 in the advance sheet of the Reporter, but it was withdrawn
from the bound volume in favor of the December version.  The only
difference between the two versions is the addition of one
paragraph, placed at the end of the majority opinion,
acknowledging that some restrictions on employee testimony——
restrictions not before the court——might pass constitutional
muster.  See Hoover, 164 F.3d at 227.  The Police Officials'
conduct in no way resembles the types of restraints that Hoover's
appended paragraph suggested might be permissible.  The paragraph
indicated, for instance, that the state may have a greater
interest in preventing policymaking employees from testifying,
and that restraints are less troublesome if they are
content-neutral.  Id.  Wholly unlike those examples, the conduct
in the instant case looks much more like the blanket,
viewpoint-based ban condemned in Hoover itself.  Indeed, if we
take the Police Officials at their word, their policy is that
people like Kinney and Hall——the very people with the expertise
that is required to prove claims of excessive force and
inadequate police supervision and training——cannot testify in any
case, anywhere, against the police because doing so is a conflict
of interest.

employment in retaliation for his expert testimony for the defendant in a criminal obscenity case. See 435 F.2d at 1034 (Rainey I). In a later appeal of the same case, we noted that a college trustee had admitted that the plaintiff was denied the teaching position because of his testimony and the publicity surrounding the same; we observed that "[t]hese facts make out what appear to us to be a clear case of impermissibly freighting plaintiff's contract with a deprivation of the First Amendment right to free speech," and we ultimately held that the plaintiff was entitled to a judgment as a matter of law. Rainey v. Jackson State Coll., 481 F.2d 347, 350 (5th Cir. 1973) (Rainey II).[38] The Rainey decisions are themselves part of a long series of First Amendment cases in which we have condemned retaliation against court testimony, including retaliation against employees who gave testimony adverse to their employers' interests. See Johnston, 869 F.2d at 1568 (county employee fired for testifying on co-worker's behalf in an administrative hearing); Reeves, 828

---

[38] Part of the Rainey plaintiff's underlying claim had been mooted by the passage of time by the date of the second appeal; we reached the merits of the claim in order to determine whether he was entitled to attorneys' fees. Rainey II, 481 F.2d at 349. This was nonetheless a holding on the merits of the First Amendment claim, as a later appeal in the same saga recognized: "Our opinion in Rainey II considered and made findings on the merits and entered a judgment sustaining Rainey's claim that his termination of employment was unconstitutional." Rainey v. Jackson State Coll., 551 F.2d 672, 675 (5th Cir. 1977) (Rainey III).

70

F.2d at 1097-99 (school employee demoted for her civil testimony in favor of her co-employee against their employer).

Judge Jones's dissent discusses in some detail three cases from other circuits that, in her estimation, show that the defendants did not violate the First Amendment and should in any event be entitled to qualified immunity. Only one of these, the Third Circuit's decision in Green, was on the books when the Police Officials began their activities.[39] The plaintiff in Green, a police officer on a drug task force, agreed to testify as a character witness at the bail hearing of the son of a longtime friend. 105 F.3d at 884. The plaintiff left the hearing without testifying after he learned that the son was associated with organized crime. Id. The police agency demoted the officer anyway, citing their interest in avoiding the appearance of an association with organized crime. Id. at 884-85. Surely it would cast a police agency into disrepute if its vice officers were thought to consort with mob figures, but the Police Officials in this appeal cannot seriously claim that their agencies will be exposed to public obloquy if a police instructor they patronize testifies for the plaintiff in an excessive force

---

[39] The Eighth Circuit decided Tedder in February 1999, after the boycott had already caused Kinney's and Hall's classes to be cancelled and after Hall had already left ETPA. The Tenth Circuit decided Worrell in 2000. Both cases are discussed supra.

case, just as he has before testified in favor of the police.[40]
Green in no way supports the Police Officials' actions.

While some of the relevant First Amendment retaliation precedents in place in the fall of 1998 involved schools (like the Rainey cases and Reeves), and others of them (such as Brawner and Victor) have involved police departments, we concede that our past cases do not include one that has specifically addressed retaliation against instructors at a police academy. We do not see the absence of such a case as an embarrassment to our conclusion that the Police Officials are not entitled to qualified immunity. If we accepted the defendants' view of what it means for the law to be clearly established, qualified immunity would be available in almost every case, even those cases in which "in the light of pre-existing law the unlawfulness [was] apparent," Anderson, 483 U.S. at 640. As the Supreme Court has recently admonished, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope, 536 U.S. at 741.

---

[40] Relatedly, we do not understand the Police Officials' assertion, advanced by the dissent, Jones dissent at 32, that Kinney and Hall somehow exploited their association with ETPA. The instructors did not seek out their role in the Kerrville case; the victim's family approached them after failing to find any qualified local experts who would testify against the police. In order to establish their competence to offer expert opinion, surely the instructors' testimony would have to mention their place of employment. The Police Officials never complained about misuse of the good name of ETPA when an instructor gave expert testimony, with pay, in favor of the police.

Although we are sensitive to the fact that reasonable officials might not always be able to predict the outcome of a balancing test such as that used in Pickering cases, see Noyola v. Tex. Dep't of Human Res., 846 F.2d 1021, 1025 (5th Cir. 1988),[41] we believe that in this case the illegality of the Police Officials' conduct is sufficiently clear that they can fairly be said to have been on notice of the impropriety of their actions. Indeed, given the factual disputes identified by the district court and taking the plaintiffs' side of those disputes,

---

[41] Noyola observed that, because of the balancing required in Pickering cases, "[t]here will rarely be a basis for a priori judgment that the termination or discipline of a public employee violated 'clearly established' constitutional rights." 846 F.2d at 1025. We do not think that this remark can be taken to set forth a rule of law to the effect that qualified immunity is mandated in Pickering cases; indeed, the Noyola opinion itself went on to analyze whether the plaintiff's alleged right actually was clearly established. See id. at 1025-26. Noyola's statement facially takes the form of a prediction that denials of qualified immunity will be "rare[]" in the Pickering context. Qua prediction, it may not be an unreasonable one. Nonetheless, a number of this court's Pickering cases have denied qualified immunity. See, e.g., Branton, 272 F.3d at 741-46; Wilson v. UT Health Ctr., 973 F.2d at 1270; Frazier, 873 F.2d at 826-27. Underscoring the fact that Noyola does not purport to command a particular result, three of the four Fifth Circuit Pickering cases that cite Noyola deny the official's claim of qualified immunity. Compare Gunaca v. Texas, 65 F.3d 467 (5th Cir. 1995) (upholding a claim of qualified immunity), with Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216 (5th Cir.), reh'g denied and opinion clarified, 336 F.3d 343 (5th Cir. 1999), Boddie v. City of Columbus, 989 F.2d 745 (5th Cir. 1993), and Brawner, 855 F.2d 187 (all denying qualified immunity). (It should be noted that Brawner cites Noyola for a different proposition.) As we state in the text, Noyola is at its predictive nadir when, as in this case, there is no true balancing required because the defendant official has not set forth any substantial legitimate interest.

73

this case does not require any real balancing at all, for the Police Officials do not have any relevant, legitimate interests to put on their side of the Pickering scales.  Our cases show that it is entirely appropriate to deny qualified immunity when the balance of cognizable interests weighs so starkly in the plaintiff's favor.  See, e.g., Boddie, 989 F.2d at 750; Frazier, 873 F.2d at 826.  This means that summary judgment must sometimes be denied in Pickering cases because of genuine factual disputes concerning whether admittedly legally important government interests are implicated on a given record.  See, e.g., Branton, 272 F.3d at 741; Kennedy, 224 F.3d at 378-79; Victor, 150 F.3d at 457; see also supra note 29 (citing cases from other circuits). Of course, the ultimate resolution of those factual disputes may show that the Police Officials are entitled to qualified immunity from liability.  See supra note 8.

We close our discussion of qualified immunity by noting that, contrary to the position asserted by the Police Officials, the district court's review of the reasons for the Police Officials' boycott does not mean that the lower court, or this court, has engaged in a "subjective" analysis of the type condemned in Harlow.  The Police Officials' position, apparently, is that they are entitled to qualified immunity as long as there exists some conceivable set of reasons that would have made their actions appropriate.  Such factual scenarios doubtless exist.  It would have been permissible for the Police Officials to pull

their students out of Kinney's and Hall's classes if (for instance) the Police Officials learned that the instructors were unskilled.  Therefore, the Police Officials suggest, we necessarily engage in a forbidden "subjective" inquiry if we take cognizance of a genuine dispute over the reasons for their actions against the instructors.  What the defendants' approach would mean, of course, is that there can never be liability for any violation for which the elements include the official's intent or reasons for action.  Most § 1983 claims do not include such an element, but First Amendment retaliation claims do: The First Amendment protects employees only from "termination <u>because of</u> their speech on matters of public concern," <u>Umbehr</u>, 518 U.S. at 675, not from termination <u>simpliciter</u>.  Similarly, the Constitution forbids officials from discriminating on the basis of race only when their discrimination is <u>intentional</u>.  <u>See</u> <u>Washington v. Davis</u>, 426 U.S. 229, 239-48 (1976).  In such cases, reading <u>Harlow</u> as forbidding all discussion of intent would allow the qualified immunity defense to preclude recovery even when the law was clearly established, for plaintiffs would be barred from proving an essential legal element of their case.[42]

---

[42]     Indeed, the Supreme Court has explicitly distinguished, on the one hand, the focused inquiry into intent that a court must undertake in connection with certain constitutional violations, from, on the other hand, the wide-ranging "subjective" inquiry into bad faith condemned in <u>Harlow</u>.  <u>Harlow</u> sought to prevent "an open-ended inquiry into subjective motivation [with the] primary focus . . . on any possible animus directed at the plaintiff."  <u>Crawford-El v. Britton</u>, 523 U.S.

75

When an official's intent or the reasons for his or her actions are an essential element of the underlying violation, we have treated factual disputes over intent just like any other factual dispute that can justify a denial of qualified immunity. See Tompkins v. Vickers, 26 F.3d 603, 607-10 (5th Cir. 1994) (holding that the existence of a retaliatory motive was a factual issue that precluded summary judgment on qualified immunity in a First Amendment case in which a teacher claimed that he had been transferred in retaliation for criticizing the school superintendent); see also Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 535 & n.6 (5th Cir. 1997) (stating that the court lacks jurisdiction on interlocutory appeal to review whether there is a genuine issue of fact as to intentional discrimination). Other circuits take the same view.[43]

---

574, 592 (1998). That inquiry would burden officials unnecessarily, because whether the defendant official bore a generalized ill will toward the plaintiff is irrelevant to the question whether the defendant official has violated clearly established law. But when intent is an element of the predicate violation, such as in claims of intentional racial discrimination or First Amendment retaliation, the inquiry into intent is permissible because it is "more specific," focusing on "an intent to disadvantage all members of a class that includes the plaintiff or to deter public comment on a specific issue of public importance." Id. (citation omitted).

[43] See, e.g., Rivera-Torres v. Ortiz Velez, 341 F.3d 86, 97 (1st Cir. 2003); Thomas v. Talley, 251 F.3d 743, 746 (8th Cir. 2001) ("In considering a qualified immunity defense, a court cannot disregard evidence of the intent that is an element of the plaintiff's case because if it did so the plaintiff could not show that the defendant violated clearly established law."); Walker v. Schwalbe, 112 F.3d 1127, 1132-33 (11th Cir. 1997) (citing cases and stating that "[w]here the official's state of

As we have said, accepting the Police Officials' position would mean that every claim of qualified immunity would necessarily be upheld in those categories of cases that require proof of intent or motive.  The proper approach, which treats intent as one fact issue among others, does <u>not</u> lead to the opposite extreme, namely that qualified immunity is never available in such cases.  That too would be an intolerable result.  Fortunately, in no area of the law can bare accusations of malice or evil intent withstand a properly supported motion for summary judgment.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986); <u>Krim v. BancTexas Group, Inc.</u>, 989 F.2d 1435, 1449 (5th Cir. 1993) (stating that unsupported assertions of bad faith cannot create a genuine issue of fact; in such a case, "summary judgment is proper even if intent is an essential element of the nonmoving party's case").  Insubstantial suits against public officials can be handled through the "firm application of the Federal Rules of Civil Procedure," <u>Butz</u>, 438 U.S. at 508, including the restrictions on discovery available in

---

mind is an essential element of the underlying violation, the state of mind must be considered in the qualified immunity analysis or a plaintiff would almost never be able to prove that the official was not entitled to qualified immunity.  We hold, as every Circuit that has considered this issue has held, that where subjective motive or intent is a critical element of the alleged constitutional violation the intent of the government actor is relevant.").

Rule 26.[44]  The case before us is not a case in which a plaintiff
seeks to impugn an otherwise legitimate official action by
casting bare accusations of malice, bad faith, and retaliatory
animus.  Kinney and Hall showed the district court sufficient
evidence, both direct and circumstantial, and much of which came
from the defendants' own words, to raise a genuine issue of fact
as to their claims.

The Police Officials' conduct, as presented in the summary
judgment record and viewed in the plaintiffs' favor, was
objectively unreasonable in light of clearly established First
Amendment law.  The district court therefore correctly determined
that the Police Officials are not entitled, at least at this
point, to qualified immunity from Kinney's and Hall's § 1983
claims alleging violations of their rights to freedom of speech
under the First and Fourteenth Amendments.

### VII. DUE PROCESS AND STATE LAW CLAIMS

In addition to their § 1985 and First Amendment claims,
Kinney and Hall also alleged a denial of due process and a state
law claim for tortious interference with business relations.  The
district court denied the defendants' motion for summary judgment

---

[44]    Indeed, several of the defendants in the instant case
moved the district court to limit discovery until the question of
qualified immunity was resolved.  The court granted the motion in
part, limiting discovery to the issue of the availability of
qualified immunity.  Therefore, it is not precisely accurate to
say, as Judge Jones does, that "all discovery is complete."
Jones dissent at 5.

on these claims. The panel of this court that initially heard the Police Officials' interlocutory appeal reversed the district court on the due process claim, finding that Kinney and Hall had not stated a violation. The panel affirmed the district court's denial of summary judgment on the state law claim. As the issues on rehearing centered upon the § 1985 and First Amendment claims, we now reinstate those portions of the panel opinion that rule on the due process and state law claims, namely Parts IV.C and V.

## VIII. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of the Police Officials' motion for summary judgment on the plaintiffs' § 1985 and First Amendment claims. We reinstate Part IV.C of the panel opinion, which REVERSED the district court's denial of summary judgment on the due process claim, and we reinstate Part V of the panel opinion, which AFFIRMED the district court's denial of summary judgment on the state law claim. We DISMISS the appeal of the cities, counties, and East Texas Police Chiefs Association for the reasons set forth in note 10 supra. Finally, we REMAND the case to the district court for further proceedings not inconsistent with this opinion. The Police Officials shall bear the costs of this appeal.

79

RHESA HAWKINS BARKSDALE, Circuit Judge, joined by Judges Jones, Smith, Emilio M. Garza, and Clement, concurring in part and dissenting in part:

> **The privilege of absurdity; to which no living creature is subject but man only.**
> THOMAS HOBBES, LEVIATHAN pt. I, ch. 5 (1651).

Primarily at issue is qualified immunity *vel non* against §§ 1983 (First Amendment) and 1985 claims. I respectfully dissent from its being denied, as well as official immunity's being denied, as a result, against the state law claim. (I concur, of course, in immunity's being granted against the Fourteenth Amendment due process claim.) Because I join Judge Jones' splendid dissent concerning the First Amendment claim, I address only § 1985.

Though well intended (as always), the majority has lost sight of the proverbial forest for the proverbial trees (as did the majority for the divided panel). First, the majority's reading of § 1985 has stretched that statute beyond all recognition; the new law it has confected leads to an absurd result. Second, it has turned its back on the fundamental, compelling reasons for qualified immunity; it ignores the discretionary element that lies at the heart of that doctrine.

With all due respect to my esteemed colleagues in the majority, it is simply nothing short of absurd to hold that the police chiefs and sheriffs are *not* vested with discretion in choosing which teachers to use (and pay) for training the police

chiefs' and sheriffs' own student-officers — the very persons the police chiefs and sheriffs are responsible for training. This cannot be the law.

## I.

Recitation of the material facts brings the ultimate issue into sharp focus. In 1998, while instructors at the East Texas Police Academy (ETPA), part of Kilgore College in Tyler, Kinney and Hall testified voluntarily in a federal court action as expert witnesses supporting an excessive force claim against the Kerrville, Texas, police department. The police chiefs and sheriffs (Officers) who sent (paid for) their student-officers to ETPA for training were concerned about a conflict of interest evidenced by Kinney's and Hall's testimony; discussed that conflict with ETPA; and decided in 1998 not to send (pay for) their student-officers to Kinney's and Hall's classes. As a result, ETPA discontinued those classes because they were no longer economically feasible.

Kinney and Hall had one-year contracts with ETPA. Thinking that his contract might not be renewed, Hall resigned from ETPA to find other employment. Kinney stayed until his contract expired and then accepted a new contract in a different position with the college.

In 1999, Kinney and Hall filed this action against Officers, their respective cities and counties, and the East Texas Police Chiefs Association, claiming violation of: § 1985(2); free speech

81

under the First Amendment and due process under the Fourteenth; and Texas law. Among other rulings on motions for summary judgment, qualified immunity was denied Officers. A divided panel of our court reversed the qualified immunity denial for the due process claim; but it affirmed the denial for the remainder (against my dissent). *Kinney v. Weaver*, 301 F.3d 253 (5th Cir. 2002), *vacated and reh'g en banc granted,* 338 F.3d 432 (5th Cir. 2003).

## II.

At issue is *qualified immunity* (interlocutory appeal), *not* the merits (appeal from final judgment). Restated, this appeal concerns only whether now, or when Officers acted in 1998, their *alleged* conduct was proscribed by law. The answer is "no"; qualified immunity must be granted.

Our standard of review for qualified immunity interlocutory appeals requires us to accept the *facts* in the light most favorable to Plaintiffs. But, of course, that standard does not require us to accept Plaintiffs' contentions on points of law. For an interlocutory appeal from the denial of qualified immunity, we have jurisdiction to accept the facts as assumed by the district court and determine whether, as a matter of law, they preclude qualified immunity. *E.g., Aucoin v. Haney*, 306 F.3d 268, 272 (5th Cir. 2002) (quoting *Nerren v. Livingston Police Dep't*, 86 F.3d 469, 472 (5th Cir. 1996)). Applying that standard to this record, we must hold,

82

*as a matter of law*, that Officers are entitled to qualified immunity.

Section 1985 makes it unlawful to, *inter alia*, "injure [a] party or witness in his ... property on account of having ... testified [freely and truthfully in a court of the United States]". 42 U.S.C. § 1985(2). In denying qualified immunity for the § 1985 claim, the majority holds: (1) the statute applies to expert witnesses; and (2) Officers' choosing to send (pay for) their student-officers to teachers other than Plaintiffs is a requisite injury to property under the statute. In so doing, the majority has lost sight of the well-known purpose for qualified immunity — to protect government officials in their *discretionary* actions, the illegality of which is *not* apparent. Accordingly, government officials are liable individually for their conduct "only if they reasonably can anticipate when [it] may give rise to liability for damages". ***Davis v. Scherer***, 468 U.S. 183, 195 (1984). Again, the ultimate issue for this interlocutory appeal is whether Officers could reasonably anticipate in 1998 that their alleged conduct could give rise to § 1985 liability. In straying from the proper inquiry, the majority has undercut the very reason for qualified immunity — the discretion that lies at its heart.

Under the well-known, two-step inquiry for deciding such immunity, the first asks whether, under current law, a valid claim has been asserted — whether a right has been violated. *E.g.,*

83

*Siegert v. Gilley*, 500 U.S. 226, 232 (1991). "[I]f no [such] right [has] been violated[,]... there is no necessity for further inquiries concerning qualified immunity". *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see, e.g., Hare v. City of Corinth, Miss.*, 135 F.3d 320, 325 (5th Cir. 1998).

Only if a valid claim has been asserted is the second step taken: was defendants' conduct objectively unreasonable under then existing clearly established law. *Hare*, 135 F.3d at 326. Of course, for this interlocutory appeal, as discussed *supra*, the issue of fact on whether Officers' conduct in 1998 was objectively unreasonable under then existing law is not at issue for this second step; we can consider only an issue of law — whether the law underlying the claimed violation of § 1985 was clearly established at the time of that conduct in 1998. Plaintiffs fail the first step; they do not assert a claim under § 1985 — for several reasons, it does not apply to expert witnesses' claims of the type made in this action concerning Officers' conduct. That ends the inquiry. In the alternative, the law underlying the claimed violation of § 1985 was not clearly established when Officers acted in 1998. For purposes of demonstrating why qualified immunity is compelled, this two-step analysis will be applied twice: first, for examining why the statute does not apply to Plaintiffs *qua* expert witnesses (part A.); second, for examining why Officers' conduct is not subject to the statute (part B.).

84

A.

In holding against qualified immunity, the majority improperly expands § 1985 by holding that expert witnesses may bring the claim at issue here if they are injured on account of their testimony. We cannot read § 1985(2) so broadly; Plaintiffs *qua* expert witnesses cannot assert this claim. In the alternative, we cannot hold that this right for expert witnesses — now newly created by our court for this case (year 2004) — was clearly established when Officers acted in 1998.

1.

First, Plaintiffs do not assert a valid claim under § 1985 — it does not apply to the post-testimony economic claim made concerning their expert testimony. It is true that expert witnesses have been used for hundreds of years; on the other hand, the professional expert witness who profits considerably from such testimony is a recent development. *E.g.,* Timothy Perrin, *Expert Witness Testimony: Back to the Future*, 29 U. RICH. L. REV. 1389, 1411 (1995) (discussing growing industry of individuals who spend substantial portions of their time testifying or consulting with litigants and even advertise their services). Congress could never have envisioned protecting against loss of income for this type of testimony when it enacted § 1985 in 1871. Even assuming, *arguendo*, the majority is correct in holding that § 1985's plain meaning encompasses the claim by these expert witnesses, **Maj. Opn.** at 27,

85

this is not necessarily determinative.  Even where a statute's meaning is plain, "we may depart from its meaning ... to avoid a result so bizarre that Congress could not have intended it".  *Moosa v. INS*, 171 F.3d 994, 1008 (5th Cir. 1999)(internal quotation marks omitted).  This is just such an instance.

By enacting § 1985, Congress intended, *inter alia*, to protect those who testified in federal court and were integral to the proper functioning of those courts, not to provide a post-testimony, economic loss claim of the type at issue here for expert witnesses.  Even allowing for the salutary "broad sweep" of Reconstruction-era civil rights statutes, *Maj. Opn.* at 28, the majority has stretched § 1985 much too far.  The reading it accords § 1985 leads to an absurd result, as evidenced by the following examples.

Expert witnesses are quite necessary to litigate certain claims (including, in some instances, those for excessive force); but such experts are readily available — to say the least.  For example, for an excessive force claim, there may be only a few fact witnesses who can testify about the force used, but there are countless experts who can opine on whether it was excessive.  Such fact witnesses are of the utmost importance; they may be able to offer the only independent evidence about what force was employed.  Moreover, a fact witness is usually under subpoena and, therefore, has no choice about whether to testify.  Accordingly, there are

86

compelling reasons to give fact witnesses a high level of protection against an injury to them or their property on account of their federal court testimony.

Obviously, the same policy considerations are not in play in protecting expert witnesses. Given their abundance and other factors bearing on their status, they are not obligated to testify in a particular case. An expert should not be given the additional protection of a private right of action if adverse economic consequences flow from his testimony.

It is true, for example, that we do not distinguish between fact and expert witnesses for claims that witnesses were intimidated in a criminal trial. As another example, we do not distinguish between fact and expert witnesses in cases involving the absolute immunity that protects them from civil liability arising from their testimony. Those matters involve the integrity of the underlying action; accordingly, we cannot permit expert witnesses to be intimidated into changing their testimony any more than we can permit that for fact witnesses; all must testify freely and truthfully.

On the other hand, a § 1985 claim of the type at issue concerns providing a remedy for an expert witness who suffers post-trial economic injury. In other words, the claim protects an expert witness' interests after he has freely and truthfully given his testimony. In many respects, however, testifying as an expert is a business; such witnesses are able to weigh the economic

benefits and risks of their testimony before agreeing to testify. Therefore, expert witnesses who *choose* to testify in a case (and are usually paid to do so, often quite handsomely) should not be able to avail themselves of § 1985 later, if adverse economic consequences flow from their testimony.

Consider the wide-ranging, truly absurd results arising out of extending § 1985 to cover post-testimony economic injury to expert witnesses of the type claimed here. Arguably, every person who testifies as an expert and is later denied employment could file an action under § 1985 against the would-be employer. For example, assume an urban planner routinely testifies in litigation against cities. Is a city now subject to § 1985(2) liability if it refuses to hire that person if he applies for a job in its planning department? The majority's permitting expert witnesses to bring claims under this statute for such injury opens the door (perhaps the proverbial floodgates) for this type claim.

2.

As noted, even if an expert witness is protected under the statute for the claim at hand, a claim could be asserted only if it arose from conduct occurring *after* the date we render our decision for this appeal; in other words, the majority has confected a new claim. Accordingly, for the second step of the qualified immunity analysis, it was not clearly established at the time of Officers'

*conduct in 1998* that expert witnesses are protected under § 1985 through a claim of the type at issue here.

In fact, as the majority admits, **Maj. Opn.** at 30, it appears that only one opinion (Second Circuit) had ever applied the statute to experts; this was done without analysis and concerned a claim for *preventing* testimony — a far cry from this case. **Chahal v. Paine Webber**, 725 F.2d 20 (2d Cir. 1984). **Chahal**'s failure to specifically address expert witnesses does not imply that § 1985 obviously applies to them. On the contrary, the fact that there is only one opinion involving expert witnesses in the long history of this statute compels concluding that expert witnesses simply do not present claims under it, precisely because it does *not* apply to them.

Moreover, one Second Circuit opinion about preventing testimony could not have clearly established in Tyler, Texas, in 1998 that Officers' actions with respect to these expert witnesses could violate § 1985. It is true that, even without judicial interpretation, violation of a statute can be clearly established for qualified immunity purposes. This is not such an instance; the very questions at issue about application of § 1985(2) to economic injury for expert witnesses compel holding, for qualified immunity purposes, that, when Officers in Tyler, Texas, acted in 1998, it was *not* clearly established that their conduct could violate § 1985(2).

B.

Assuming, *arguendo*, that § 1985 covers expert witnesses for the claim presented in this action, Officers are still entitled to qualified immunity because the requisite "injury to property" by Officers for § 1985 liability is lacking. Therefore, Plaintiffs still fail to assert a claim; in the alternative, when Officers acted in 1998, this law was *not* clearly established.

1.

Officers' actions underlying the § 1985 claim are not the kind proscribed by the statute. For the majority to hold otherwise is to stretch § 1985(2) beyond all recognition.

a.

Regardless of Officers' reasons for doing so, electing in 1998 not to enroll (pay for) their student-officers in a class cannot be the requisite injury to property violative of § 1985. ***Haddle v. Garrison***, 525 U.S. 121 (1998), is not to the contrary. The fact that, under ***Haddle***, a plaintiff has a § 1985 claim for interference with at-will employment does not compel holding that Officers' choice in 1998 not to enroll student-officers in Plaintiffs' classes is an injury under the statute. Plaintiffs' status as at-will employees is irrelevant, because sending student-officers to teachers at ETPA other than Plaintiffs is not a cognizable injury under § 1985.

90

In *Haddle*, the Supreme Court analogized to tort law claims concerning interference with economic relationships and held that third-party interference with at-will employment can constitute an injury under § 1985. *Id*. at 126. The Court defined tortious interference with economic relations as "maliciously and without justifiable cause induc[ing] an employer to *discharge an employee*, by means of false statements, threats or putting in fear". *Id*. (quoting 2 T. Cooley, Law of Torts 589-591 (3d ed. 1906))(emphasis added). The majority states that, "*according to the district court*, [Officers] ... *tried* to have the plaintiffs fired from their jobs", *Maj. Opn.* at 32 (emphasis added); but, in the next breath and quite contrary to our limited standard of review, the majority greatly overstates Officers' "trying" conduct by equating it with "coercing an employer into firing an employee", *id*. Trying to coerce an employer into firing an employee is *not* tortious interference with employment. Rather, as the majority concedes, *id*., the "classic case" for such interference (as evidenced by all cases cited both by the majority and this dissent, including *Haddle*) concerns a plaintiff's being *actually discharged*. Kinney was not discharged; Hall resigned of his own volition; and neither claims he was constructively discharged. Therefore, Officers' conduct does not constitute an injury to property under tort law or § 1985(2).

91

For qualified immunity purposes here, and if we analogize to tort law, refusing to enroll (pay for) student-officers in a class does not equate with "maliciously inducing" an employer to discharge an employee. A typical case of such tortious interference with economic relations would involve a defendant's demanding that a plaintiff be fired, or telling lies about him in order to have him fired, followed by the employee's being fired. *E.g.,* **Ahrens v. Perot Systems Corp.**, 205 F.3d 831, 836 (5th Cir.) (discussing in judicial estoppel context plaintiff's earlier claim that she had been fired because defendants tortiously interfered with her employment by revealing confidential and disparaging information about her), *cert. denied*, 531 U.S. 819 (2000); **Sterner v. Marathon Oil Co.**, 767 S.W.2d 686 (Tex. 1989) (upholding finding tortious interference because defendant *directed* plaintiff's employer to fire him).

It is simply not the law that the refusal to enroll (pay for) student-officers (regardless of Officers' motive) is the kind of interference actionable under tort law, especially for § 1985.

b.

While the analogy to tort law is instructive, the purpose and history of § 1985 also compel holding that Plaintiffs do not assert a claim. The Supreme Court noted in **Kush v. Rutledge**, 460 U.S. 719, 727 (1988), that "[p]rotection of the processes of the federal courts was an essential component of Congress' solution [via § 1985

92

enacted in 1871] to disorder and anarchy in the Southern States".

When it enacted § 1985 in an effort to protect such processes, Congress cannot possibly have intended a scenario akin to compelling Officers' to enroll (pay for) their student-officers in Plaintiffs' classes. Allowing Officers to decide who teaches their student-officers, even if motivated by Plaintiffs' expert testimony, is hardly the type of "disorder and anarchy" that Congress was addressing in 1871. Although the statutory language of § 1985 is broad, it cannot be read so broadly as to encompass Officers' actions — especially where, as here, the issue is qualified immunity, *not the merits*. To so read § 1985 is, again, to give it an absurd result and to create new law. The majority's comments concerning ***Kush***'s rejection of a racial animus requirement for certain § 1985 claims, ***Maj. Opn.*** at 28 n.14, are irrelevant to our conclusion that Plaintiff's injury is not cognizable under the statute. Instead, ***Kush*** elucidates that allowing a claim based on Officers' choice not to enroll their students in classes produces an absurd result in the light of the Congressional goal for § 1985(2) — protecting the processes of the federal courts.

The majority tries to limit its holding by stating that "the statute does not create liability for every adverse action taken against a witness after the witness testifies in a federal case", because of the limiting principle in § 1985 that the injury must be "on account of his having so attended or testified". ***Maj. Opn.*** at

93

36. The majority pays lip service to the other important limiting principle contained in § 1985 — that the adverse action taken against the witness be an "injury to property".  Even assuming that Officers acted "on account of" Plaintiffs' testimony, Officers' choice to enroll (pay for) their student-officers in other instructors' classes is *not* the requisite injury to property.

The majority would allow any reaction to a witness' testimony to be actionable if it were in response to that testimony.  This is too broad.  The statute limits actionable responses to those that injure the witness' property.  Although interference with at-will employment is such an injury, choosing not to enroll (pay for) student-officers in a particular class, is not.  Plaintiffs do *not* assert a claim.  Accordingly, our inquiry should stop at step one.

2.

In the alternative, taking the second step for qualified immunity analysis only makes it more evident that Officers are entitled to qualified immunity.  Surely, this step compels awarding it.  Again, this step involves deciding whether Officers' conduct in 1998 was objectively unreasonable in the light of then *clearly established* law.  *Hare*, 135 F.3d at 325.  As discussed, and for this interlocutory appeal, we are concerned only with an issue of law — whether the law was *clearly established* when Officers acted in 1998; we are *not* concerned with an issue of fact — whether

94

Officers' conduct in 1998 was objectively unreasonable in the light of then existing clearly established law.

Officers stopped sending (paying for) their student-officers to Plaintiffs' classes in October 1998. Despite the majority's take on this, *Maj. Opn.* at 31-36, *Haddle*'s being decided two months later in December did not clearly establish that Officers were then (or later) violating § 1985(2). Moreover, *Haddle* was decided after Kinney's and Hall's classes were removed in November from the schedule. The majority contends that Officers acted in furtherance of the conspiracy after December because they "continued to prohibit their officers from enrolling in Kinney's or Hall's classes", *Maj. Opn.* at 34; but Officers could not have prohibited enrollment in classes that were not on the schedule. The majority's continuing conspiracy theory attempts to obscure the obvious — it was not clearly established when Officers acted in 1998 that their actions violated the statute. In addition, *Haddle* gave no indication, *nor has any other case*, that an act as benign as Officers' sending (paying for) their student-officers to different teachers at a police academy is an injury to property under § 1985(2).

### III.

The ultimate issues for this interlocutory appeal are whether Plaintiffs assert a valid claim; and, only if so, whether that law was clearly established when Officers acted in 1998. Plaintiffs do

95

not assert a § 1985 claim; moreover, given the majority's extreme extensions of existing § 1985 law needed in order to hold against qualified immunity, it is obvious that the law now confected by the majority was not clearly established when Officers acted in 1998.

Therefore, qualified immunity must be awarded against the § 1985 claim.  For the reasons stated by Judge Jones, it must also be awarded against the First Amendment claim.  Finally, as a result and for the reasons stated in my dissent from the panel opinion, 301 F.3d at 296, official immunity must be awarded against the state law claim.

Accordingly, I respectfully dissent from not granting immunity against those claims.

EDITH H. JONES, Circuit Judge, with whom SMITH, BARKSDALE, EMILIO M. GARZA, and CLEMENT, Circuit Judges, join, Concurring in Part and Dissenting in Part:

With all due respect to our colleagues, one of Judge Barksdale's opening statements puts this case in perspective:

> [I]t is simply nothing short of absurd to hold that the police chiefs and sheriffs are not vested with discretion in choosing which teachers to use (and pay) for training the police chiefs and sheriffs' own student-officers — the very persons the police chiefs and sheriffs are responsible for training. This cannot be the law.

In holding otherwise, as he says, the majority "has turned its back on the fundamental, compelling reasons for qualified immunity; it ignores the discretionary element that lies at the heart of that doctrine." The majority has rendered a very un-balanced analysis of the balancing tests required in this case. This portion of our dissent will address the qualified immunity claim of the police officials as it relates to the teachers' claims for First Amendment retaliation. Judge Barksdale's portion of the dissent discusses the police officials' potential liability for violating 18 U.S.C. § 1985 and their corresponding immunity claim.

## I.  Background

To set the stage for the police officials' actions against Kinney and Hall, it is useful to recount undisputed facts concerning their expert testimony and the officials' concerns. They agreed, without following ETPA instructions to obtain prior approval, to become paid experts in 1997 on behalf of the plaintiffs in Gonzales v. City of Kerrville. A year later, at trial, the Kerrville newspaper reported that eyewitnesses testified

the suspect had fired in excess of forty shots while standing on the Guadalupe River Dam hitting objects including an apartment window, a garbage can and a patrol car window. The defendant police sniper testified that he first told the suspect to drop his rifle, and when the suspect lifted the rifle and pointed it at him, the officer killed the suspect in self-defense. Kinney's and Hall's expert conclusions were that the sniper's failure to apply his training and defendant, City of Kerrville's lack of a proper policy were proximate causes of the tragic shooting and that the sniper's use of deadly force amounted to excessive force.

Rejecting these expert opinions, the jury found in favor of the Kerrville police officer, and the federal district judge overturned the award against the city. After Kinney's and Hall's opinion was rejected, the take-nothing judgment was affirmed by this court on appeal. See Gonzalez v. City of Kerrville, 205 F.3d 1337 (5th Cir. 1999).

The police officials have deposed or attested, inter alia, that appellees' expert testimony hurt the close working relationship required between academy instructors and representatives of the cities and counties; damaged teamwork required among those involved in training officers; threatened the confidentiality of information city and county officers share with Kinney and Hall about their procedures and practices; undermined feelings of loyalty and confidence; and represented an improper use of the instructors' affiliation with ETPA.

98

## II.  Standard of Review

While the majority correctly cites the general standards of review for summary judgment and qualified immunity appeals, they repeatedly mischaracterize the court's function in free speech cases and thus would send to the jury issues that it is our obligation to decide.  This case is, we are agreed, governed by the balancing test framed by the Supreme Court in Pickering v. Bd. of Educ., 391 U.S. 563, 88 S.Ct. 1731, 1734-35 (1968), and refined and extended by Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684 (1983), and Board of County Commissioners v. Umbehr, 518 U.S. 668, 116 S.Ct. 2342 (1996).  The relevant issues are:  (1) whether an employee's or contractor's speech constituted a matter of public concern; (2) whether the public employer's legitimate countervailing government interests outweigh the value of the protected speech; (3) whether the protected speech was a substantial or motivating factor in the discipline or termination; and (4) whether the employer would have acted against the employee for some other conduct regardless of the speech.  See Umbehr, 518 U.S. at 675, 116 S.Ct. at 2347.  The first two issues are matters for the court to decide de novo while the last two may comprise jury issues.  See Williams v. Seniff, 342 F.3d. 774, 782 (7th Cir. 2003); Melton v. City of Oklahoma City, 879 F.2d 706, 713 (10th Cir. 1989).  Courts, not juries, determine the extent of protection accorded to First Amendment conduct as matters of policy and

uniformity.  Melton, 879 F.2d at 713 (concluding that "the trial court improperly submitted to the jury the question of whether [the plaintiff's] speech was constitutionally protected").

The majority, unfortunately, appears to have confused the second and third issues and thus would leave to the jury the fundamental question of First Amendment protection that is ours to decide.  The majority holds that because a fact dispute exists as to whether Kinney and Hall were "blackballed" or "boycotted" to enforce a "code of silence" (the third Pickering issue), this court may not take into account the police officials' proffered institutional reasons for disenrolling their officers from appellees' classes (the second issue).  The majority reasons because it must give Kinney and Hall the benefit of drawing all inferences in their favor on summary judgment review, a trial is required to determine the legitimacy of the governmental interests. The weight those interests receive in the Pickering balance is, however, for this court to decide.  Accordingly, sending to the jury issues crucial to the Pickering balance would be improper.

That this court alone decides the Pickering balance is reinforced by several facts.  First, all discovery is complete, and there is no real dispute about the operative facts.  Second, whether one characterizes the police officials' actions as merely "disenrolling" students from appellees' classes or as "black-balling" or "boycotting" the instructors is a matter of semantics, not motive.  Third, there is no evidence that the officials

100

themselves used the term "blackball" or "boycott" to describe their actions; those pejoratives were used by ETPA President Holda and pervade the appellees' complaint and the district court opinion. Finally, the majority opinion itself concludes that the police officials advanced no legitimate interests to place in the Pickering balance, and it freely evaluates the disputed evidence. See, e.g., Kinney v. Weaver, __ F.3d __, (footnotes 3, 4, 25) (5th Cir. 2003) (en banc). In other words, while purporting to rest on the existence of disputed fact issues, the majority has rendered its conclusion on the first and second Pickering issues listed above. The majority's de facto balancing is additionally undermined, not only by its failure to take the entire record into account, but by its erroneous requirement that the police officials prove actual disruption, to the exclusion of potential disruption, caused in their departments by the protected speech. The Supreme Court has held, to the contrary, that an employer's legitimate concern about potential disruption arising from protected speech is entitled to deference. Umbehr, 518 U.S. at 676, 116 S.Ct. at 2348 (recognizing that the Court has "consistently given greater deference to government predictions of harm used to justify restriction of employee speech") (citations and quotations omitted).

The majority's miscalculation of Pickering balancing necessarily affects its conclusion on qualified immunity, as the

101

majority reiterates that there are <u>no</u> legitimate governmental interests on the police officials' side of the balance.

Unlike the majority, we neither wash our hands of the crucial responsibility to determine the extent of protection owed to Kinney's and Hall's voluntary expert testimony, nor obscure the <u>Pickering</u> determination with erroneous or unsupported fact issues. Thus, while deferring balancing at this point, we must acknowledge the existence of legitimate governmental interests on the police officials' side.

### III.  Qualified Immunity

The doctrine that confers qualified immunity from suit on public officials performing discretionary functions is not an "insignificant aberration." <u>See</u> <u>Pierce v. Smith</u>, 117 F.3d 866, 882 (5th Cir. 1997).  For over twenty years, the Supreme Court has explained that qualified immunity strikes a balance between providing redress to individuals for abuses of public office and protecting society against claims that "frequently run against the innocent as well as the guilty[.]"  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736 (1982).  Society bears the cost of unfounded lawsuits in "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." <u>Id</u>.  There is also the "danger" that "fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public

102

officials], in the unflinching discharge of their duties.'"  Id. (citation and quotation omitted).

For these reasons, qualified immunity shields discretionary official conduct to prevent lawsuits that do not allege violations of clearly established constitutional law of which a reasonable person would have known.  Harlow, 457 U.S. at 819, 102 S.Ct. at 2739.  The standard of conduct embodies objective legal reasonableness.  So measured, qualified immunity affords "ample protection to all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096 (1985).  To disentitle public officials to qualified immunity, the unlawfulness of their conduct "must be apparent," Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039 (1987), and "all reasonable officials would have realized the particular challenged conduct violated the constitutional provision sued on[.]"  Pierce, 117 F.3d at 871 (citations omitted).  Indeed, if "officers of reasonable competence could disagree on th[e] issue, immunity should be recognized."  Malley, 475 U.S. at 341, 106 S. Ct. at 1096.  The law is clearly established only where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151, 2156 (2001) (emphasis added).

No doubt, the test of objective legal reasonableness does not always require immunity in the absence of an identical or even

103

"materially similar" case to guide official conduct.  See Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 2516 (2002).  In Hope, the Court held that Alabama prison officials could have readily inferred from pre-existing authority that it was unconstitutional to chain recalcitrant prisoners painfully and long to a "hitching post."  Id.  As a context-specific denial of qualified immunity, Hope does not spring eternal for Kinney and Hall.  The contrasts between the two cases are plain.

First, the Eighth Amendment proscribes "unnecessary and wanton infliction of pain" on prisoners, Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986).  With only two paragraphs of discussion, the Court in Hope found in the prisoner's allegations an "obvious" Eighth Amendment violation.  Hope, 536 U.S. at 741, 122 S.Ct. at 2516.  In this case, however, rather than dealing with an "obviously cruel" practice (compare Hope, 536 U.S. at 745, 122 S. Ct. at 2518), the court confronts a First Amendment protection of free speech that is not unequivocal; courts must accommodate the public interest in effective provision of government services when the speaker works for or on behalf of the government. No rigid rule of liability exists.  See Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35.  Thus, the majority requires well over 20 pages of legal reasoning to explain why the police officials could not constitutionally disenroll their students from Kinney's and Hall's classes.

Just as the governing constitutional standard in <u>Hope</u> was simpler, so was the determination that the law was clearly established. An earlier circuit court case had specifically held unconstitutional, inter alia, the practice of handcuffing prisoners to "the fence and to cells for long periods of time . . . ." <u>Gates v. Collier</u>, 501 F.2d 1291, 1306 (5th Cir. 1974).[45] Another case had held it unconstitutional to deny water to a prisoner as punishment for his refusal to work, explaining that conduct which jeopardizes the prisoner's health or inflicts physical abuse after he stops resisting authority is actionable. <u>Ort v. White</u>, 813 F.2d 318, 325 (11th Cir. 1987). Finally, a Department of Justice report to Alabama authorities condemned exactly the corporal punishment at issue in <u>Hope</u>.

Despite the majority's creative review of Fifth Circuit government employee free speech precedents, none of our cases had remotely conducted the free speech balancing inherent in the relation between law enforcement departments and police academy instructors. As will be seen, the only related authorities were decided outside this Circuit and uniformly denied liability or granted immunity.

Thus, that "fair warning" could be given to the prison officials in <u>Hope</u> does not modify the general test for qualified

_____

[45] As the Supreme Court noted, cases decided by the Fifth Circuit before the split that created the Eleventh Circuit remain binding in the Eleventh Circuit.

105

immunity applicable in this case. As the Court acknowledged, "in some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary." Hope, 536 U.S. at 741-42, 122 S.Ct. 2516 (quoting United States v. Lanier, 520 U.S. 259, 269, 117 S.Ct. 1219 (1997))(internal citations and quotations omitted). Nor did Hope cast doubt on the Court's decision that to determine whether the law is clearly established, public officials should consider controlling cases in their own jurisdiction or, alternatively, refer to a consensus of persuasive authority outside it. Wilson v. Layne, 526 U.S. 603, 617, 119 S. Ct. 1692, 1700 (1999).

Only recently, this Court expressed en banc our caution toward denying qualified immunity in novel factual cases. In McClendon v. City of Columbia, 305 F.3d 314, 332 (5th Cir. 2002)(en banc), the author of today's majority opinion found it compelling that no court in 1993 had applied the state-created danger theory of § 1983 liability to a similar factual context. This court held that "qualified immunity should be granted 'if a reasonable official would be left uncertain of the law's application to the facts confronting him.'" Id. at 332 (quoting Salas v. Carpenter, 980 F.2d 299, 311 (5th Cir. 1992))(other citation omitted).[46]

---

[46] Likewise, there is no case in this circuit that denied qualified immunity under the circumstances presented here. The majority's failure to point to such a case is persuasive evidence that these officers were "uncertain of the law's application to

106

Further, despite the adoption of the state-created danger theory of liability by nearly all other circuit courts at the time of the conduct in question, this court denied that they comprised a consensus of cases of persuasive authority sufficient to provide "fair warning," because the constitutional right was not defined with "sufficient clarity to enable a reasonable official to assess the lawfulness of his conduct." Id. at 332-33. This court concluded that:

> The fact that the state-created danger theory was recognized at a general level in [other courts'] precedents did not necessarily provide Officer Carney with notice that his specific actions created such a danger. . . . [T]his is not a situation where 'a general constitutional rule already identified in the decisional law . . . appl[ied] with obvious clarity to the specific conduct in question.'

Id. (internal citation and quotation omitted). McClendon then states: "Indeed, general principles of the law are less likely to provide fair warning where, as here, applicability of the doctrine is highly context-sensitive." Id. at 332 n.13 (citation omitted).

As the foregoing authorities suggest, for immunity purposes, the question "is not whether other reasonable or more reasonable courses of action were available" to public officials. See Pierce, 117 F.3d at 883. Immunity shields officials so long as their conduct is reasonable, even though wrong in hindsight. Saucier, 533 U.S. at 205, 121 S. Ct. at 2158. The question here is whether, among police chiefs and sheriffs similarly situated to the

the facts confronting [them]." Id.

appellants, "all but the plainly incompetent" would have realized at the time that what they did violated Kinney's and Hall's First Amendment rights to testify voluntarily as expert witnesses. Pierce, 117 F.3d at 883 (citing Hunter v. Bryant, 502 U.S. 224, 228, 112 S.Ct. 534, 537 (1991)).

To apply these principles of qualified immunity, the Supreme Court's two-step test normally begins by considering whether, on the facts alleged by the plaintiffs, any constitutional violation occurred; if a violation could be made out, "the next, sequential step is to ask whether the right was clearly established," i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Saucier, 533 U.S. at 201-02, 121 S.Ct. at 2156.

The majority's errors become evident by inverting the process here. Consequently, let us assume arguendo that the police chiefs and sheriffs violated the First Amendment by disenrolling their students from Kinney's and Hall's classes. Assume, that is, that the appellees engaged in some level of protected speech, and Pickering/Connick balancing applies. The qualified immunity question is as framed by the majority:

> We must ask whether it was clearly established at the time of the Police Officials' conduct that the First Amendment forbade them from retaliating against Kinney and Hall, the employees of their contractor, on account of the instructors' Kerrville testimony.

Kinney, __ F.3d at __. Our answer is resoundingly that the law was not clearly established.

The law was not clearly established for three reasons. First, this court and seven other circuits have recognized that public officials are more likely entitled to qualified immunity when the underlying constitutional law depends on balancing tests enforced by the judiciary, and no factually similar case exists. Second, the Fifth Circuit cases relied on by the majority are critically different from this case, while other circuits' more relevant precedents either found no liability or qualified immunity for law enforcement officials. Third, in an unprecedented approach to Pickering/Connick balancing, the majority inflates the value of the appellees' "speech," while discounting from the balancing test the police officials' legitimate interests; no "clearly established law" supports the majority's approach.

A. **Qualified Immunity and Constitutional Balancing**.

At the heart of Kinney's and Hall's First Amendment claim is the case- and context-specific Pickering/Connick balancing test. In Pickering and its progeny, the Supreme Court has balanced the interest of each plaintiff as a citizen in commenting on matters of public concern against the interests of the state, as an employer or contractor, in promoting the efficiency of the public services it performs. Id. at 568, 88 S.Ct. at 1735; see also Connick, 461 U.S. at 140, 103 S.Ct. at 1686. Pickering emphasized, however, that in view of the "enormous variety of fact situations" in which critical statements by public employees may be thought by their

superiors to furnish grounds for dismissal, it was not "appropriate or feasible to attempt to lay down a general standard" for resolving free-speech claims of public employees and that it could only "indicate some of the general lines along which an analysis of the controlling interests should run." Pickering, 391 U.S. at 569, 88 S.Ct. 1735. Subsequently, the Court acknowledged that the particularized balancing required by Pickering is difficult even for judges to accomplish. See Connick, 461 U.S. at 150, 103 S.Ct. at 1692. In short, "while it may have been clear since 1968 that a citizen does not forfeit First Amendment rights entirely when he becomes a public employee [or contractor], the scope of those rights in any given factual situation has not been well defined." Benson v. Allphin, 786 F.2d 268, 276 (7th Cir. 1986).

For immunity determinations, the implications of this rule-avoiding constitutional standard seem obvious. The Supreme Court has alluded to the enhanced likelihood of granting qualified immunity in First Amendment cases:

> Even when the general rule has long been clearly established (for instance, the First Amendment bars retaliation for protected speech), the substantive legal doctrine on which the plaintiff relies may facilitate summary judgment . . . . [T]here may be doubt as to the illegality of the defendant's particular conduct (for instance, whether a plaintiff's speech was on a matter of public concern).

Crawford-El v. Britton, 523 U.S. 574, 592-93, 118 S. Ct. 1584, 1594 (1998). Fifteen years ago, this court explained that:

> One consequence of case-by-case balancing is its implication for the qualified immunity of public

110

> officials whose actions are alleged to have violated an employee's First Amendment rights. There will rarely be a basis for <u>a priori</u> judgment that the termination or discipline of a public employee violated "clearly established" constitutional rights.

<u>Noyola v. Texas Dep't of Human Res.</u>, 846 F.2d 1021, 1025 (5th Cir. 1988). <u>Noyola's</u> "self-evident tenet of qualified immunity jurisprudence," <u>see</u> <u>Moran v. Washington</u>, 147 F.3d 839, 846 (9th Cir. 1998), has been embraced by at least seven other circuits.[47] Even before <u>Noyola</u>, the Seventh Circuit held that when a constitutional rule involves the balancing of competing interests, the standard may be clearly established, but its application is so fact dependent that the "law" can rarely be considered "clearly established." <u>Benson</u>, 786 F.2d at 276. In such cases, "the facts of the existing case law must closely correspond to the contested

---

[47] <u>Moran v. Washington</u>, 147 F.3d 839, 847 (9th Cir. 1998) (stating that in <u>Pickering</u> balancing cases, "the law regarding such claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity"); <u>Kincade v. City of Blue Springs, Mo.</u>, 64 F.3d 389, 398 (8th Cir. 1995) ("[W]hen <u>Pickering</u>[]. . .is at issue, the asserted First Amendment right can rarely be considered 'clearly established'. . . ."); <u>DiMeglio v. Haines</u>, 45 F.3d 790, 806 (4th Cir. 1995) (noting that only "infrequently" will the law be clearly established when a balancing of interests is involved); <u>O'Connor v. Steeves</u>, 994 F.2d 905, 917 n.11 (1st Cir. 1993) (same); <u>McDaniel v. Woodard</u>, 886 F.2d 311, 314 (11th Cir. 1989) (quoting <u>Noyola</u> and finding qualified immunity applicable because the constitutional right was unclear); <u>Melton v. City of Oklahoma City</u>, 879 F.2d 706, 729 (10th Cir. 1989) ("In some circumstances, the fact-specific nature of the <u>Pickering</u> balancing may preclude a determination of 'clearly established law'. . . ."), <u>vacated on other grounds</u>, 928 F.2d 920 (10th Cir. 1991) (en banc); <u>Benson v. Allphin</u>, 786 F.2d 268, 276 (7th Cir. 1986) (stating that the application of fact-dependent law "can rarely be considered 'clearly established'").

111

action before the defendant official is subject to liability under Harlow [v. Fitzgerald]." Id. Noyola, Moran and Benson express the consensus view among circuit courts.

While the majority relegates Noyola to a footnote, that case remains the law of this Circuit. Judge Higginbotham, for instance, cited Noyola when observing that, "the fact-specific balancing test of Pickering complicates the question of whether an act violated clear law. This is because the question is not only the clarity of the standard but its clarity in application." Boddie v. City of Columbus, 989 F.2d 745, 750 (5th Cir. 1993). Judge Garwood added that qualified immunity

> principles have particular force where, as here, resolution of whether the defendant's conduct violated the constitutional provision sued on is heavily dependent on a balancing or weighing against each other of different factors according to the degree they are present in the matrix of facts constituting the particular context in which the asserted violation occurred.

Pierce, at 882. Noyola has been frequently cited in our court.[48]

---

[48] See Keenan v. Tejeda, 290 F.3d 252 (5th Cir. 2002); Harris v. Victoria Indep. Sch. Dist., 336 F.3d 343, 345 (5th Cir. 1999) (on petition for reh'g) (per curiam) (specifically stating that Noyola "reflects the law of this circuit"); Pierce v. Smith, 117 F.3d 866 (5th Cir. 1997); Wallace v. Texas Tech Univ., 80 F.3d 1042 (5th Cir. 1996); Vander Zee v. Reno, 73 F.3d 1365 (5th Cir. 1996); Gunaca v. Texas, 65 F.3d 467 (5th Cir. 1995); Brady v. Ford Bend County, 58 F.3d 173 (5th Cir. 1995); Boddie v. Columbus, 989 F.2d 745 (5th Cir. 1993); Caine v. Hardy, 943 F.2d 1406 (5th Cir. 1991) (en banc); Kinsey v. Salado Indep. Sch. Dist., 916 F.2d 273 (5th Cir. 1990), vacated by, 950 F.2d 988 (5th Cir. 1992) (en banc); Connelly v. Comptroller of Currency, 876 F.2d 1209 (5th Cir. 1989); Price v. Brittain, 874 F.2d 252 (5th Cir. 1989); Evans v. Dallas, 861 F.2d 846 (5th Cir. 1988) (per curiam); Brawner v. Richardson, 855 F.2d 187 (5th Cir.

<u>Noyola</u> counsels judicial reticence toward abrogating qualified immunity in government employee First Amendment cases, but it does not act as a dispensation of the duty to examine each case carefully. In several cases, after citing <u>Noyola</u>, this court has denied the defense.[49] When, as here, the First Amendment case law is dissimilar from the precedents, we must echo the caution expressed in <u>Noyola</u>, <u>Boddie</u>, <u>Pierce</u>, and among the circuits that fact-sensitive balancing of "the matrix of factors constituting the particular context in which the asserted violation occurred" gives particular force to an immunity defense. In such cases, "a very high degree of prior factual particularity may be necessary." <u>Hope</u>, 536 U.S. at 741, 122 S. Ct. at 2516; <u>see</u> <u>also</u> <u>McClendon</u>, 305 F.3d at 332 n.13.

## B.  Finding Similar Cases for Immunity Comparison.

Against the backdrop of <u>Noyola</u> and the First Amendment balancing standards, we conclude that no reasonable police chiefs and sheriffs could have clearly understood in October, 1998 that they were violating the First Amendment by refusing to enroll their recruits in Kinney's and Hall's classes. No compelling or compellingly analogous Fifth Circuit case law gave the officials "fair warning" in this context-sensitive balancing area of

1988).

[49]  <u>See</u> <u>Harris</u>, 168 F.3d at 225; <u>Boddie</u>, 989 F.2d at 750; <u>Brawner</u>, 855 F.2d at 193.  These cases have little bearing on the application of <u>Pickering</u> balancing here.

constitutional law. Cases from other circuits uniformly granted extra deference to law enforcement officials' decisions.

The majority apparently overlooks the requirement that there be a higher degree of similarity between cases to satisfy the clearly established law prong of qualified immunity. The majority concedes that "our past cases do not include one that has specifically addressed retaliation against instructors at a police academy." Instead, the majority relies exclusively on ordinary whistleblower cases[50] and one case brought by a college professor who testified as an expert witness.[51] Such cases entail, however, a significantly different mix of interests for balancing purposes than the one before us.

Consider first the "ordinary" whistleblower cases. This court has consistently held that a public employee is "speaking out on a matter of public concern" when he becomes a "whistleblower" and thus complains of, or testifies against, fellow employees' misconduct or against his employer's practices. This court has protected a wide variety of whistleblower conduct, some of it emanating from within law enforcement agencies. All of these

---

[50] Brawner, 855 F.2d at 191-92; Matherne v. Wilson, 851 F.2d 752, 761 (5th Cir. 1998).

[51] Rainey v. Jackson State Coll., 481 F.2d 347 (5th Cir. 1973). Reeves v. Claiborne County Bd. of Educ., 828 F.2d 1096 (5th Cir. 1987), is also cited by the majority as a case concerning an educator, but it does not involve expert testimony and protects truthful fact testimony against one's employer's interest.

cases, however, concerned fact witnesses, employees who had personal knowledge of misconduct within their own governmental units.

In holding that ordinary whistleblower cases afford "clearly established law" for this case, the majority elides several critical distinctions. Foremost, Kinney's and Hall's testimony did not equate with whistleblower conduct. Their opinions were valuable only insofar as they correspond with someone else's account of the underlying facts. But it is the eyewitness who "blows the whistle," not the expert who simply synthesizes and interprets the factual testimony. Qualified expert testimony is fungible, not irreplaceable. The majority implies, nevertheless, that without Kinney's and Hall's expert testimony, the plaintiff in the Kerrville case would have been unable to pursue his claim. Thus the public has a special interest in receiving expert opinions. This suggestion blinks reality. Our litigious culture affords well-qualified experts in every conceivable specialty, including law enforcement practices and training. If the majority intends, not so subtly, to hint that these experts had unique credibility because of their affiliation with ETPA, their implication proves the police officials' contention: Kinney and Hall created a conflict of interest by taking advantage of their job titles in the courtroom.

Not only is the speech in whistleblower cases generically different from appellees' expert testimony, but the corresponding

115

interests of public employers are different. This court has been unsympathetic to employer retaliation against government whistle-blowers, since their unorthodox conduct may furnish the public's only protection against internal misconduct. A public employer has little, if any, legitimate interest in hiding dirty linen from the taxpaying public. The case before us is not, however, so easily pigeonholed. The police officials are not concealing misdeeds within their departments. Indeed, since the Kerrville plaintiff on whose behalf Kinney and Hall testified left court empty-handed, the police officials' "retaliation" did not ultimately stifle the exposure of wrongdoing. The majority's facile analogy with ordinary whistleblower cases is simply wrong. We have here assumed that the police officials' actions would not satisfy the Pickering/Connick balancing test after careful analysis, but such a legal conclusion does not so ineluctably follow from a few citations to whistleblower cases as to "clearly establish" the guiding law.

The majority's analogy to cases involving educators is also weak. In Rainey, this court concluded that a college teacher's contracts were unconstitutionally breached because of his testimony as a defense expert witness in a pornography case. Rainey v. Jackson State Coll., 481 F.2d 347, 349 (5th Cir. 1973). Holding that the breach violated Rainey's First Amendment rights, this court did not engage in Pickering balancing. Id. at 349-50. By its nature, Rainey's testimony could not have conflicted with

116

the interests of his employer. No countervailing employer interests were advanced by the college against Rainey's right to testify. Legally and factually, Rainey is a poor fit with this case.

Closer factually to the instant case is the policy of Texas A&M University (and a state legislative appropriation provision), implemented before the police officials took action directed at Kinney and Hall, that broadly forbade university employees from testifying as expert witnesses for parties adverse to the state's interests. See Hoover v. Morales, 164 F.3d 221, 223-24 (5th Cir. 1998). The police officials cite the policy as reflecting clearly established law in the Fifth Circuit. The majority discounts appellants' reliance, because the policies were under federal court challenge, and ultimately did not survive. We agree that Hoover's context is sufficiently different as not to furnish controlling authority in support of the police officials.

By the same token, however, the majority ought to concede that Hoover reinforces the principle that in this context-sensitive balancing area of constitutional law, what is clearly established must be closely related factually and legally to a case at hand. Significantly, this Court in Hoover "assumed that there will be occasions when the state's interests in efficient delivery of public services will be hindered by a state employee acting as an expert witness or consultant . . . ." 164 F.3d at 226 (emphasis added). Hoover concludes by stating:

117

But our task in this case requires us to apply a *Pickering* case-by-case analysis, and in doing so we conclude that the expert witness rider and TAMUS policy No. 3105 are impermissibly overbroad. Our opinion does not foreclose consideration of rules and regulations aimed at limiting expert testimony of faculty members or other state employees which adhere to our First Amendment jurisprudence.

164 F.3d at 227. Unlike the majority opinion, <u>Hoover</u> does not oversimplify <u>Pickering</u> balancing and in its way lends powerful support to the officials' plea that no clearly established Fifth Circuit law condemned their actions regarding Kinney and Hall.

While the majority has strained to find that clearly established Fifth Circuit law was contrary to the police officials' conduct, they ignore or minimize, in the immunity discussion, three circuit court cases involving alleged retaliation by law enforcement agencies for non-whistleblower testimony.

The case most closely on point is <u>Tedder v. Norman</u>, 167 F.3d 1213 (8th Cir. 1999), decided only a few months after the events at issue here. Tedder was the Deputy Director of the Arkansas Law Enforcement Training Academy. After voluntarily testifying as an expert for the plaintiff in an excessive use of force case, Tedder was demoted. The Eight Circuit affirmed a summary judgment in Tedder's First Amendment lawsuit against his supervisor. The court held that:

Testimony concerning possible misconduct of public officials is speech on a matter of public concern that warrants constitutional protection, . . . but, as the district court stated, "it is not the place for an employee of ALETA, let alone its Deputy Director to volunteer to give such testimony without a subpoena."

118

167 F.3d at 1215.  Further, the court found a "significant threat of disruption to the relationships between the [academy] and the law enforcement agencies that it trains." <u>Id</u>. at 1215.   On balancing the relevant interests, the court ruled for the defendant against Tedder's claim of unconstitutional retaliation.  <u>Id</u>.

The majority would distinguish <u>Tedder</u> because the defendant there testified against an officer employed by a law enforcement agency actually trained by the Arkansas academy.  The <u>Tedder</u> court never specifically emphasizes this fact, however, and it found that the testimony caused "actual disruption and potential further disruption" to the academy.  <u>Id</u>.  <u>Tedder</u> not only undercuts the majority's First Amendment analysis, but clearly supports a finding of qualified immunity.   It would be a strange constitutional rule indeed that protects a public employer's adverse action against an employee for expert testimony, but punishes the non-employer for concerns over the very same activity. Even stranger would be the denial of qualified immunity to the non-employer whose internal relations are most affected by the expert testimony, while Tedder's supervisor was granted qualified immunity.  <u>Id</u>.

The majority also ignores a Third Circuit case, decided well before the events here, which exonerated a law enforcement agency that demoted one of its officers for voluntarily appearing as a character witness (for a friend's son) at a bail bond hearing. <u>Green v. Philadelphia Hous. Auth.</u>, 105 F.3d 882 (3rd Cir. 1997).

119

In Green, the officer left the hearing, declining to take the stand, when he learned that the son was charged with involvement in a drug ring. The court found that the officer's decision to testify constituted First Amendment protected activity, but also that the public's interest in his voluntary court appearance is "somewhat more limited than it would be if his appearance were subpoenaed." 105 F.3d at 888 (citing cases).

Ultimately, the Pickering/Connick balancing test weighed in the department's favor, as an employer, because of its significant interests in protecting the department's reputation and in successfully fighting drugs and crime. The court held that "any risk of departmental injury or disruption weighs heavily under the Pickering balancing test." Id. Green thus found for the police department even though Green's supervisor had previously approved his court appearance.

For immunity purposes, Green is closely related contextually to the present case. Green attributed significant weight to the police department's justification for its disciplinary action, and it carefully explains why not all court testimony is equivalent for First Amendment purposes. In these ways, Green furnishes a backdrop for the police officials' conduct just the opposite of the synthetic "clearly established law" concocted by the majority.

The third case relevant for immunity purposes was brought against an Oklahoma district attorney and agents for the Oklahoma

120

Bureau of Narcotics and Dangerous Drugs, alleging that the rescission of an offer of employment to coordinate the DA's drug task force was based on the plaintiff's previous expert witness testimony for a murder defendant. Worrell v. Henry, 219 F.3d 1197 (10th Cir. 2000). The murder trial in which the would-be employee testified involved the killing of one of the narcotics bureau's agents. The court granted summary judgment for the district attorney, who was the prospective employer, but it denied summary judgment and qualified immunity to the chief narcotics bureau agent. The Tenth Circuit held that Pickering/Connick balancing was appropriate to evaluate the First Amendment consequences of the district attorney's refusal to hire Worrell, but it did not find Pickering appropriate to analyze the alleged retaliation by the non-employer, non-contractor agents of the narcotics bureau. In reaching the latter conclusion, the court acknowledged "that there may be instances in which the operations of a third party agency are so intertwined with the operations of the employing agency that the Pickering balancing should be applied." Worrell, 219 F.3d at 1212, n.3.

Worrell demonstrates that if the police officials' role is viewed through the Pickering/Connick lens, their claim to immunity should be ironclad. Even if their position more closely resembles that of the narcotics bureau agents, however, they could argue that they fall under Worrell's caveat because their operations are closely intertwined with ETPA.

121

We may end this section where we began. Because this case involves constitutional balancing, the "clearly established law" must have existed at a higher level of specificity than might be required in other types of immunity cases. This is hardly an extraordinary conclusion. It follows as a negative implication from this court's en banc holding in McClendon that, absent controlling circuit authority, "a 'consensus of cases of persuasive authority' might, under some circumstances, be sufficient to compel the conclusion that no reasonable officer could have believed that his or her actions were lawful." McClendon, 305 F.3d at 329. In this case, the Fifth Circuit precedents cited by the majority involve fundamental distinctions in the nature of the speech as well as the public employer's interests. While useful, such cases hardly compel the conclusion that the police officials could not properly disenroll their officers from Kinney's and Hall's classes. The majority overlooked other circuits' cases that discussed Pickering balancing in the specific context of law enforcement agencies and various types of testimony. Whether or not the majority would agree with the outcome of those cases, two of them predate the police officials' conduct here, and they should be regarded as constituting a consensus of persuasive authority arrayed against the majority's conclusion. At best, one must conclude that there was no "clearly established law" that gave the police officials "fair warning" of the unconstitutionality of their conduct. See McClendon, 305 F.3d at 332-33 (no consensus of cases

122

from other jurisdictions where those cases applied the constitutional rule differently and facts were insufficiently similar; qualified immunity granted to police officer).

## C.   Novelty in the Majority's Balancing Exercise.

The third proof of error in the majority's qualified immunity analysis arises from the way it strikes the Pickering/Connick balance.  In October, 1998, no court had held that a law enforcement employee's right to testify voluntarily as an expert witness outweighed the interests of the agency.  See Worrell, 299 F.3d at 1206-07 (discussing prior circuit court cases and noting that even where Pickering balancing favored the employee, a different result might be reached where an agency could show a disruption in its operations).  And to this day, no cases have, in the law enforcement context, elevated non-whistleblower testimony so high, or rated the department's interests so low, as the majority does here.  This is not to say (at this point) that the majority is incorrect, but the novelty of this balance cuts against any conclusion that "clearly established law" proscribed the police officials' conduct.  The appellants' position thus resembles that of the county supervisors in Umbehr, whose qualified immunity was upheld on appeal while the Supreme Court approved the application of Pickering/Connick balancing to the relations between independent contractors and government entities.  See generally, Umbehr, 518 U.S. 668, 116 S.Ct. 2342.

123

Because the majority has exaggerated the analogy between voluntary expert testimony and whistleblower testimony, it elevated Kinney's and Hall's interests in testifying as voluntary expert witnesses to almost absolutely protected status. The majority has thus extended or partially overruled Hoover v. Morales, which rejected such an absolutist approach. See Hoover, 164 F.3d at 227. From the perspective of other circuits, too, the majority's conclusion is unprecedented. The Tenth Circuit has specifically held otherwise: "First Amendment protection of public employees' testimony is not absolute. There are instances in which government entities' interests as employers outweigh employees' interests in free expression and the policy of encouraging truthful and uninhibited testimony." Worrell, 219 F.3d at 1205. Worrell then described with approval the way in which the courts in Green and Tedder evaluated the clash between law enforcement officers' rights to testify and their agency's significant interests. Worrell, 219 F.3d at 1206-07. In Green, as noted above, the Third Circuit held that the officer's voluntary appearance at a bail hearing, although constitutionally significant, was entitled to less weight. Green, 105 F.3d at 888-89. The Eighth Circuit in Tedder also decided that the voluntariness of the deputy director's expert testimony in a police brutality case lessened its First Amendment protection. Tedder, 167 F.3d at 1215. No other case has ascribed to voluntary expert witness testimony like that of Kinney and Hall such elevated First Amendment status.

124

Likewise, in unprecedented fashion, the majority holds for naught the police officials' description of their institutional interests in controlling the education of department officers.[52] The majority's hostility toward the police officials' position is contrary to Waters v. Churchhill, which described the government's "significant" interest as an employer as follows:

> When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her.

511 U.S. 661, 675, 114 S.Ct. 1878, 1887-88 (1994). Waters further noted:

> [W]e have consistently given greater deference to government predictions of harm used to justify restrictions of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large. Few of the examples we have discussed involve tangible, present interference with the agency's operation. The danger in them is mostly speculative.

511 U.S. at 673, 114 S.Ct. at 1887. In Umbehr, too, the Court reminded that, "Pickering requires a fact-sensitive and deferential weighing of the government's legitimate interests." Umbehr, 518 U.S. at 677, 116 S.Ct. at 2348.

As was previously explained, the expert testimony caused an uproar because police officials and student-officers feared

---

[52] The majority relies on two cases in concluding the appellants have no legitimate interests in the Pickering balancing. Both are inapposite. In one of these, the policeman was disciplined for associating with a union. See Boddie, 989 F.2d at 747. The other involved a prison nurse's whistleblower activity. Frazier v. King, 873 F.2d 820, 826 (5th Cir. 1989).

Kinney and Hall might use information gleaned in their classes to testify against the sponsoring agencies; that their testimony interfered with unfettered classroom discussions; and that they misused their affiliation with ETPA to enhance their testimony. One can certainly understand the sensitivity of the police officials about Kinney's and Hall's testimony. Far from exhibiting wanton police brutality, the <u>Gonzales</u> case portrayed an officer's life endangered by a deranged shooter. Such situations are the stuff of law officers' nightmares and domestic tragedies. There is no evidence that Kinney and Hall were lawyers, and they are entitled to their professional opinions as law enforcement instructors. Nevertheless, feelings of loyalty, confidence and teamwork between the agencies and the instructors were understandably strained by this testimony. Further, it is evident that the instructors enhanced their credibility because of their association with ETPA, and that the police officials might legitimately question whether the instructors' impartiality was undermined because they initially agreed to be paid experts.

The majority might refuse to defer and throw all these institutional concerns to the winds in its First Amendment analysis. But in doing so, not only does it abuse the general cautions expressed by the Supreme Court, but it contradicts authorities from several circuits. In <u>Green</u>, the Third Circuit described as "very significant" the interests of the housing authority police department as an employer where the officer's

126

voluntary testimony created a "risk of departmental injury based on the 'potential disruptiveness of the speech.'" (Green, 105 F.3d at 888, quoting Waters, 511 U.S. at 680, 114 S.Ct. at 1890.)

In Tedder, the court concluded that Tedder's testimony caused actual disruption and potential further disruption between ALETA and the law enforcement agencies that it was charged with training. Tedder, 167 F.3d at 1215. The court was concerned that students' loss of faith in the ALETA's Deputy Director, who had the authority to approve or veto lesson plans, could spread to every class taught there. See id. The Eighth Circuit has elsewhere recognized in emphatic terms the heightened interests of law enforcement agencies. See, e.g., Shands v. City of Kennett, 993 D.2d 1337, 1344-45 (8th Cir. 1993); Tindle v. Caudell, 56 F.3d 966, 971-73 (8th Cir. 1995).

In Worrell, the Tenth Circuit reiterated that "personal loyalty and confidence among employees are especially important in law enforcement" and noted that "[t]hese concerns are heightened in smaller offices and departments, where relatively minor distur-bances in morale may create significant problems." Worrell, 219 F.3d at 1208. The court adds that the district attorney was not obliged to wait for an actual breakdown in the functioning of his taskforce before taking action. Id. at 1208-09. He was entitled to rely on reasonable predictions of workplace disruption. Id.; see also Waters, 511 U.S. at 673, 114 S.Ct. at 1887 (noting

127

the "substantial weight [afforded] to government employers' reasonable predictions of disruptions").

The Seventh Circuit has repeatedly held that "'[d]eference to the employer's judgment regarding the disruptive nature of an employee's speech is especially important in the context of law enforcement.'" Williams v. Seniff, 342 F.3d 774, 783 (7th Cir. 2003) (quoting Kokkinis v. Ivkovich, 185 F.3d 840, 845 (7th Cir. 1999)).

Finally, the Sixth Circuit has held that police officials are entitled to qualified immunity for taking reasonable administrative action to preclude one of their officers from exploiting his uniform and his position in the police department to advocate on behalf of the National Rifle Association. See generally, Thomas v. Whalen, 51 F.3d 1285 (6th Cir. 1995). While acknowledging the protected status of the officer's political speech, the court pointed out that "no court has recognized a right to exploit one's rank in public employment solely for the purpose of enhancing credibility for personal or political gain." Whalen, 51 F.3d at 1291.

In addition, the majority wholly overlooks that public employers are entitled to deference in dealing with employees whose trust and loyalty are essential to the functioning of a public office. See, e.g., Connick, supra, 461 U.S. at 151–52, 103 S.Ct. at 1692 ("When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to

128

the employer's judgment is appropriate."); <u>Kinsey v. Salado Indep.</u> <u>Sch. Dist.</u>, 950 F.2d 988, 994 (5th Cir. 1992)(en banc).  There can hardly be any dispute that law enforcement instructors occupy a sensitive and extremely important position with respect to the agencies' mission.  If training fails because the trainees have lost confidence in their instructors and are unwilling to discuss issues frankly with them, the consequences can be disastrous.  The above-cited cases specifically refer to institutional loyalty as a quality especially required in law enforcement agencies, yet the majority ignores it.

At this point, we have assumed the correctness of the majority's final conclusion that a First Amendment violation occurred.  But in its novel approach to balancing the instructors' interests against those of the law enforcement agencies, the majority is making new law, not simply expounding "clearly established law."  Kinney and Hall may choose to pursue their suits against the municipal entities, but the individual defendants are entitled to qualified immunity.

## IV.  Was There a Violation of the First Amendment?

Although we have demonstrated that the police officials were entitled to qualified immunity regardless of whether their conduct violated the First Amendment, we would also hold that their actions were not, under the <u>Pickering/Connick</u> balancing test, unconstitutional.

*Pickering* "requires a fact-sensitive and deferential weighing of the government's legitimate interests." *Umbehr*, 518 U.S. at 677, 116 S.Ct. at 2348. In holding that *Pickering* balancing applies to cases in which a governmental entity appears to condition the provision of contracts on a third party's constitutionally protected expression, the Supreme Court observed that the "nuanced" *Pickering* approach, "which recognizes that a variety of interests may arise in independent contractor cases, is superior to a bright-line rule distinguishing independent contractors from employees." *Id*. at 678. The Court also found it "far from clear, as a general matter, whether the balance of interests at stake is more favorable to the government in independent contractor cases than in employee cases." *Id*. at 680, 116 S.Ct. at 2350.

Whether Kinney and Hall are classified as third-party independent contractors or as employees is not as significant as how their overall function, and their voluntary expert testimony, affected the law enforcement agencies' performance of a public mission. Compare *Umbehr*, *id*. at 679, 116 S.Ct. at 2349 (noting that a bright-line rule that "would leave First Amendment rights unduly dependent on whether a state law labels a government service provider's contract" as one of employment or a contract for services is "a very poor proxy for the interests at stake"). To the extent the majority opinion depends on labeling Kinney and Hall as independent contractors rather than employees, its analysis is

130

oversimplified and inconsistent with Umbehr.[53] Further, the majority's reliance on this court's cases involving government contractors is hollow, since neither the speech at issue in those cases nor the governmental interests at stake is comparable to the present case.[54]

Balancing the interests in this case on a clean slate, the appellees' testimony constituted speech on a matter of public concern and was entitled to some level of constitutional protection. For reasons previously discussed, we, unlike the majority, do not characterize the protection as "extremely strong." Other circuits' opinions have properly distinguished voluntary testimony from testimony under subpoena. See Green, 105 F.3d at 888; Tedder, 167 F.3d at 1215. Further, voluntary expert witness testimony is distinct from standard whistleblower conduct, and on the facts of this case, Kinney's and Hall's expert opinions were not essential to exposing wrongdoing by a policeman or a police department.

---

[53] In the foregoing qualified immunity discussion, this opinion, like the majority's, necessarily focuses on government employee cases, since those are the most common. Proper Pickering analysis, however, balances the relevant interests without regard to labels.

[54] See N. Miss. Communications v. Jones, 792 F.2d, 1330 (5th Cir. 1986) (county board retaliated against newspaper for critical editorials and stories) and Blackburn v. City of Marshall, 42 F.3d, 1925 (5th Cir. 1995) (wrecker service denied permission to use police radio frequency after complaint to police chief; no Pickering analysis at all).

131

The interests of the law enforcement agencies have been well-documented in other cases, where it has been held that there is a "special need for deference to the employment decisions of those responsible for insuring public safety." Kokkinis, 185 F.3d at 845. Law enforcement agencies have "a more significant interest than the typical government employer in regulating the speech activities of [their] employees in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence." Tyler v. City of Mountain Home, 72 F.3d 568, 570 (8th Cir. 1995) (internal quotation marks and citations omitted). The police officials here deposed or attested that appellees' expert testimony hurt the close working relationship required between academy instructors and representatives of the cities and counties; damaged teamwork required among those involved in training officers; threatened the confidentiality of information officers share with their instructors about procedures and practices; undermined feelings of loyalty and confidence; and represented an improper use of the instructors' affiliation with ETPA. The police officials offered evidence of actual and potential disruption to their training programs and departments.

Two factors detract, in the majority's view, from the strength of these articulated interests and the deference they are due. First, it is contended that because appellees testified "400 miles away" from ETPA and in a case not involving a trainee or

132

department sponsor of the ETPA program, the police officials'
concerns are misplaced. The distance between Kerrville and
Kilgore, Texas, is a red herring. Both cities are in Texas, both
are governed by the same regime of state and federal law, and there
is no showing that police officers trained in east Texas rarely or
never migrate to other areas of the state, or that ETPA's influence
spreads no further than the boundaries of its sponsoring
department. The "400 mile argument" is disingenuous.[55]

That the expert testimony posed a conflict of interest
with Kinney's and Hall's status as instructors, despite its taking
place outside ETPA's formal jurisdiction, is a conclusion entitled
to deference. As the majority notes, the police officials did not,
in events leading up to this case, explain how they used the term
conflict of interest, but the officials' ineloquence does not mean
their judgment is entitled to no weight. Moreover, it is evident
that in testifying before a Kerrville jury, the appellees' status
as instructors at a Texas police academy would enhance their
credibility and lend the prestige of ETPA to their words. By their
status, the instructors necessarily implicated the sponsoring
departments (despite any professional disclaimers) in the legiti-
macy of their expert opinions. Even if other possible standards
for conflicts of interest, e.g., detracting from their time

---

[55] We need not and do not speculate whether expert
testimony given outside the State of Texas would have a different
impact on the evaluation of the agencies' interests.

133

available to prepare for and conduct ETPA classes or "double-dipping" on salary and witness fees, are excluded, a conflict existed in this sense. See, e.g., Thomas v. Whalen, 51 F.3d at 1292 (discussing a government entity's interest in preserving the appearance of impartiality).

More consequential is the majority's criticism that the police officials could not legitimately discipline Kinney and Hall to enforce an "unwritten code" of silence, whereby police officers do not testify against each other. We agree that enforcing the "code of silence" to stifle speech concerning police misconduct is not a legitimate governmental interest. The evidence shows, however, that this was not a contemporaneous justification formally offered for the police officials' conduct, and, in fact, reference to an "unwritten code" was made by only one of the appellants, during a television interview. As can be seen from the wealth of detail in the majority opinion, this case contained an abundance of contemporary oral and documentary evidence as well as post-litigation depositions that explored the police officials' reasons for their action. That only one reference appears throughout the record to an "unwritten code" is significant. This stray remark should not be blown out of proportion.

The dominant theme in cases that have considered the Pickering balance in the context of law enforcement is the need for a high degree of personal loyalty and confidence, esprit de corps, harmony and good morale within departments and between instructors

134

and trainees.  <u>Tedder</u>, for instance, relied on the interests of the actual employer, the police training academy, which has only an indirect stake in the results of training.  <u>Tedder</u>, 167 F.3d at 1215.  <u>Tedder</u> reflects the even stronger interests of the officials in this case, whose departments and officers rely on the academy's training for the sake of the public.  In <u>Worrell</u>, the Tenth Circuit held that a district attorney's interest in preventing disruption with other law-enforcement agencies outweighed the applicant's interest in avoiding retaliation for his testimony as an expert witness against a police officer.  <u>Worrell</u>, 219 F.3d at 1208-09.  In <u>Green</u>, the reputation and law enforcement capacity of the housing authority police were held to prevail over an officer's decision to testify voluntarily.  <u>Green</u>, 105 F.3d at 888-89.  The Seventh Circuit has on several occasions held that protected speech was subordinate to the institutional interests of law-enforcement agencies.  <u>See</u> <u>Seniff</u>, 342 F.3d at 783-85; <u>Kokkinis</u>, 185 F.3d at 844-45.

In stark contrast to those cases, the majority here ignores the paramilitary interests of the law-enforcement agencies and reduces their "legitimate" concerns to the instructors' competence and teaching ability.  As a matter of law, and based on this record, those interests are too narrowly defined.

We conclude that this is a closer case under <u>Pickering</u> balancing than others in the law enforcement area.  While Kinney and Hall engaged in protected conduct, their voluntary expert

135

testimony did not carry such a high degree of public importance, in general or in the facts of this case, as ordinary whistleblower testimony. Further, we owe special deference to the law enforcement agencies' legitimate interests in maintaining discipline, harmony, confidentiality and morale in their departments and training programs. We also note that while the police officials opined that Kinney and Hall should be fired, they succeeded only in disenrolling their students from the instructors' classes. They did not and could not directly terminate appellees' employment.

On balance, we conclude that the police officials did not violate the First Amendment by disenrolling their students from appellees' classes. The officials have the discretion to decide, consistent with the First Amendment, by whom their officers will be taught.

## V. Conclusion

For the foregoing reasons, I respectfully dissent from the denial of qualified immunity on the appellees' First Amendment claims, and I join Judge Barksdale's dissent.

E. Grady Jolly, Circuit Judge, Dissenting:

I respectfully dissent and agree with Judges Jones and Barksdale that the defendant law enforcement officers are entitled to qualified immunity and should be released from <u>personal</u> liability. It seems disingenuous to hold that the law is <u>clearly</u> established when it takes 20,467 words to explain, and when six United States Court of Appeals judges sharply disagree about it. To my way of reasoning, the majority has turned the words, and the doctrine, of "clearly established" on its head when it denies immunity in this novel case.